**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | |
|---|---|
| MADELINE CRUZ | : |
| Plaintiff, | : |
| | : |
| v. | :     Civil Action No. 02-CV-4372 |
| | : |
| PENNRIDGE REGIONAL POLICE | : |
| DEPARTMENT | : |
| And | : |
| OFFICER TIMOTHY MALONEY | : |
| c/o Pennridge Regional Police | : |
| Department | : |
| Defendants. | : |

_____:

**ORDER**

AND NOW, this          day of                    , 2003, upon consideration of Defendants

Pennridge Police Department and Officer Timothy Maloney's Motion for Summary Judgment,

and Plaintiff's response in opposition thereto,  it is hereby **ORDERED, JUDGED and**

**DECREED** that the motion for Summary Judgment is denied.

BY THE COURT:


_____
J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | | |
|---|---|---|
| MADELINE CRUZ | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 02-CV-4372 |
| | : | |
| PENNRIDGE REGIONAL POLICE | : | |
| DEPARTMENT | : | |
| And | : | |
| OFFICER TIMOTHY MALONEY | : | |
| c/o Pennridge Regional Police | : | |
| Department | : | |
| Defendants. | : | |

---

**PLAINTIFF MADELINE CRUZ' RESPONSE
TO THE MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS**

Plaintiff, Madeline Cruz, by and through her undersigned attorneys, Feldman and Pinto,

P.C., hereby responds to the Motion for Summary Judgment of Defendants Pennridge Police

Department and Officer Timothy Maloney as follows:

1.      Admitted.

2.      Admitted in part, denied in part.  It is admitted that Plaintiff alleges that she was

subjected to gender and racial discrimination during the course of her employment.  Plaintiff's

complaint sets forth other causes of action which speaks for itself. The complaint is incorporated

herein by way of reference and further response.

3.      Denied.  It is denied that plaintiff has not produced sufficient evidence to maintain

her causes of action for discrimination.  Plaintiff responds by incorporating by reference and

response, as if same were fully set forth at length herein, plaintiff's brief in opposition to

defendants' Motion for Summary Judgment.

4.      Admitted.

5.      Denied.  It is denied that plaintiff cannot prove a *prima facie* case for defamation against defendant Maloney.  Plaintiff responds by incorporating by reference and response, as if same were fully set forth at length herein, plaintiff's brief in opposition to defendants' Motion for Summary Judgment.

6.      Admitted.

7.      Denied.  It is denied that plaintiff has not proven a *prima facie* case against the defendants for intentional infliction of emotion distress or wrongful discharge.  Plaintiff responds by incorporating by reference and response, as if same were fully set forth at length herein, plaintiff's brief in opposition to defendants' Motion for Summary Judgment.

8.      Denied.  It is denied that defendants are entitled to summary judgment on all counts.

                        Respectfully submitted.
                        FELDMAN & PINTO, P.C.


                        By: _____
                              J. Bradley McDermott, Esq.
                              I.D. No.: 43934
                              1604 Locust Street - 2R
                              Philadelphia, PA 19103
                              Attorney for Plaintiff
                              (215) 546-2604

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | |
|---|---|
| MADELINE CRUZ | : |
| Plaintiff, | : |
| | : |
| v. | :     Civil Action No. 02-CV-4372 |
| | : |
| PENNRIDGE REGIONAL POLICE | : |
| DEPARTMENT | : |
| And | : |
| OFFICER TIMOTHY MALONEY | : |
| c/o Pennridge Regional Police | : |
| Department | : |
| Defendants. | : |

---

**PLAINTIFF'S BRIEF IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Madeline Cruz, by and through her attorneys Feldman & Pinto, hereby submits

this brief in opposition to defendants' motion for summary judgment.

**I.      COUNTER STATEMENT OF THE FACTS**

Plaintiff began her employment with the Pennridge Police Department (hereinafter

"Pennridge") in May of 1998 and was terminated on November 9, 1999.  Plaintiff's work

performance was at all times progressing well until September of 1999 when she complained

about serious and pervasive sexual and racial harassment as detailed below. Plaintiff maintains

that  her discharge was in retaliation for complaining about the harassment and that the stated

reasons for her discharge were but a pretext to conceal the hostile work environment tolerated by

the men charged with running the Department. The following statement of facts evidences that

Plaintiff endured harassment so severe or pervasive as to alter the conditions of her employment

and create an abusive working environment in violation of  Title VII.

**PLAINTIFF' INTERNSHIP AT PENNRIDGE AND LATER HIRING AS FULL TIME POLICE OFFICER**

Plaintiff, Madeline Cruz, is a 32-year-old Hispanic female who resides at 320 Erie Avenue in Telford, New Jersey. She is a 1988 high school graduate of North Penn High School.  After graduation she held various jobs and continued her education by attending part-time college courses at Montgomery County Community College.  In 1998 she graduated from the Montgomery County Police Academy receiving her Act 120 training[1].  (See Plaintiff's Dep. Tr. attached hereto as Exhibit A, pp. 10-15.)  Plaintiff learned that the Pennridge Police Department was looking for police interns and she applied for the position and was accepted in May of 1998. The program ran from May 1998 through Labor Day.  (See Ex. "A" pp. 18, 19.)  The Pennridge Police Department was created in 1992 and incorporated three former police departments of East Rockhill Township, West Rockhill Township and Sellersville Borough in Bucks County (See Dep. Transcripts of Officer Harry Hallman, Exhibit "B", p.5; and Sergeant Rodney Blake, Exhibit "C", p.5).  According to Sgt. Rodney T. Blake (employed by Pennridge since its creation in 1992) Pennridge never had a minority or female officer in its employ except for Madeline Cruz. (See Exhibit C, pp. 5, 6).  At the time,  Pennridge employed about 15 police officers --12 patrolmen; 2 Sergeants, a Lieutenant and the Chief. (See  Dep. Tr. of Timothy Maloney attached as Exhibit D, pp. 14).

When Madeline Cruz was hired as an intern she was assigned a Field Training Officer (FTO), Defendant Timothy Maloney. Defendant Maloney was in fact a rookie himself having only

---

[1]Act 120 training is a police officers' education and training program, formerly the Act of June 18, 1974, PL 359, 53 P.S. §§740-749.1, repealed and replaced by the Act of December 19, 1996.  Similarly provisions are now found at 53 Pa.C.S. §§2161-2171.

received his Act 120 training in October of 1996. His first police job was Pennridge when he

started in August of 1997. (See Exhibit D, pp. 9, 10). At the same time that Madeline Cruz

Pennridge was hired Pennridge also hired a male police intern named Frederick Roesner. (See

Exhibit A, p. 19). Timothy Maloney remained Plaintiff's field training officer during her

internship period from May, 1998 through Labor Day, 1998. Officer Maloney testified he was

given no guidance as to the responsibilities of a Field Training Officer and was the sole person

assigned to evaluate Plaintiff's performance as a police officer. (Exhibit "D", pp. 24-26). Officer

Maloney testified that Officer Cruz' performance was "wonderful" and recommended that she be

hired as a full time officer (Exhibit "D" p. 35). Timothy Maloney was responsible to evaluate the

Plaintiff's work performance as an intern on a quarterly basis. Because the internship lasted only

the summer, the evaluations were almost every month. The final quarterly evaluation of Plaintiff

is attached as an Exhibit to Maloney's deposition (Exhibit "D") and concludes with a handwritten

note which states:

> ..."Overall Cruz is progressing as I hoped. I see her addressing the areas that need
> it and her biggest problem is experience, which she is unable to control. Based on
> the last three months I have worked along side her it has been a pleasure to watch
> her grow into a fine officer. Based on my personal experience and evaluation of
> Officer Cruz I would be happy to recommend her for a full time position and
> would be honored to work alongside her."

Notwithstanding Officer Maloney's glowing evaluation, Plaintiff was not happy with

Officer Maloney as her FTO. Plaintiff testified that during her internship, Officer Maloney was

hostile and unprofessional. Any time Plaintiff asked a question, Maloney was condescending.

According to Plaintiff, Officer Maloney would not mistreat her in front of other officers, but

would do it when they were alone. Plaintiff early on complained about Maloney's mistreatment

3

to Sergeant Detective McGlinchy, Officers Brian Pfaff and Intern Officer Roesner. (See Exhibit A, pp. 29-36.)

In September of 1998, a permanent full time police officer position was available at Pennridge and both Plaintiff and intern Frederick Roesner were invited to apply for the position. Both were interviewed by the a police Board of Commissioners. During her interview for the full time position Plaintiff was asked questions such as whether she planned to marry and have children and how that would affect her police career. (See Exhibit "A" p.38.) Plaintiff was taken surprised by the Board's inquires. After interview she asked Officer Roesner whether he had been asked the same questions. Plaintiff learned that he had not. (See Exhibit "A" p. 40.) Notwithstanding the "wonderful" performance evaluations by Officer Maloney the job was awarded to Officer Roesner. Fortunately for Plaintiff, another permanent full time police officer position became available and Plaintiff was offered the job. (See Exhibit "A" pp. 22-23.)[2]

After Plaintiff was hired full time, Officer Brian Pfaff, (a nine-year veteran of Pennridge) was assigned as Plaintiff's FTO. Officer Pfaff testified that he was Plaintiff's FTO for about a month's time and that her performance was "average...same as any other new officer." He testified that nothing stood out as a problem. (See Dep Tr. of Brian Pfaff attached as Exhibit "E", pp. 11-14). Madeline Cruz also again worked with Tim Maloney on his same shift. Officer Maloney indicated he was partners with the Plaintiff and Officer Pfaff but each worked from three separate squad cars and each of the Officers was assigned one of the three sectors that make up the Pennridge Police Department (East Rockhill, West Rockhill and Sellersville Borough) (See

---

[2]Plaintiff questions whether she would have been hired had other male interns been available. Truth be told there were no other interns to fill the job.

Exhibit "D" p. 38-39). Again Maloney testified that during this time period he had no problems with her work performance.  (See Exhibit "D" p. 46.)

## PLAINTIFF'S WORK INJURY

On November 15, 1998, Plaintiff injured herself while replacing a dislodged sewer manhole cover during the course of her duties as a police officer. On November 16, 1998, her superiors directed her to be seen at Grandview Hospital's Industrial Medical Center. A medical report issued by Dr. Barry indicated that she was unable to perform her full duties and she was listed as "injured–on-duty". (See memo dated 11/17/98 from Police Chief Randall Dilling to Plaintiff attached as Ex. "F") The physicians at Grandview Hospital's Industrial Medical Center kept Plaintiff on "injured on duty" status until January 11, 1999 at which time Dr. Barry cleared her to return to full duty with no restrictions. (See Interdepartment memo dated 1/11/99 also attached as Exhibit "F"). During Madeline Cruz' injured-on-duty time, the plaintiff met with Chief Randall Dilling and expressed her concerns about offensive and harassing pictorials/cartoons created by other officers. (See Exhibit "A" pp. 48, 49.). The pictorials are attached as Exhibit "B" to Plaintiff's second amended complaint and attached hereto as Exhibit Ex. "G". The first pictorial depicts Officer Maloney in a cartoon titled "Pennridge Regional First Female Set to Retire." Officer Maloney is depicted as if injured and commenting to Plaintiff, "You fucking bitch. I'll show you hurt." Madeline Cruz is depicted next to a nurse and a blurb from her mouth states, "See Tim, I'm hurt. My nurse works on me all day long. I'm sure I'll feel better after the holidays." (See Exhibit "G") Plaintiff testified that the cartoon/pictorial was displayed on a board in the men's locker room known as the "Humor Board" (See Exhibit "A" p. 56). Plaintiff was in the locker room to borrow Officer Roesner's gun holster. Plaintiff removed the cartoon from the humor board, copied it and then complained to Sergeant Detective

6

McGlinchy  who she considered to be a supervisor at the time (See Exhibit "A" pp. 54-58).

The second pictorial (which Plaintiff also discovered on the humor board) is attached as Exhibit "G" and again includes a picture of the Plaintiff holding a manhole cover. The picture states "Pfaff pulled a muscle in his back lifting 365 lbs.  Guess who is still working????? Cruz? Pfaff?".  The pictorial goes on to state, "Injured officer says ...Sorry 'A.J.' have a Merry Xmas." See you all next year????".  The picture in large type says "It's not my fault" Plaintiff testified that A.J., as referenced in the cartoon, is Police Officer A. J. Burke of  Pennridge who apparently had to work over the Christmas holidays as a consequence of plaintiff's injured-on-duty status.  (See Exhibit "A" pp. 59-60.)  Plaintiff testified that she believed the pictorial/cartoons were created by Officer Brian Rickabaugh and that Officer Brian Pfaff would sometimes put in the written blurbs and/or bubbles with the written comments in them (See Exhibit "A" pp. 51, 52).

Defendant Officer Tim Maloney testified that he first saw the Exhibit "G" pictorial/ cartoons on the humor board in the men's locker room.  He did not know who created the pictorial/cartoon but admitted that the picture of him in the cartoon came from a canine (K-9) demonstration.  Officer Maloney admitted that he was upset about Madeline Cruz being out of work.  He testified it put extra stress on him and stated "...it stunk."  (See Exhibit "D" pp. 49-52.)

Sergeant James Apgar admitted that he also saw the pictorial/cartoon with the manhole cover attached as Ex. "G"on the humor board but did not inquire into who created the pictorial. (See Exhibit "H" p. 36).  Sergeant Apgar[3] testified that all the members of his "A" platoon

---

[3]Sergeant James Apgar was plaintiff's sergeant and supervisory officer.  Pennridge Police were organized and broken down into two platoons,  "A" and "B". The "A" platoon was headed by Sergeant James Afgar and "B" by Sergeant Rodney Blake.  Plaintiff was assigned to the "A" platoon, together with Police Officers Brian Pfaff, Brian Rickabaugh, Timothy Maloney and A.J. Burke.  (See Apgar, Dep.Tr.  p. 29, Ex."H".) Sgt Rodney Blake of "B" platoon admitted to seeing

complained about Cruz' injury and questioned the genuineness of her injury.  Sgt Apgar admitted

that as a matter of Pennridge policy and/or rule Officer Cruz was not permitted to return to work

without clearance from a doctor (See Exhibit "H" pp. 38-40).

### PLAINTIFF WAS REPEATEDLY SUBJECTED TO INCIDENTS OF <u>            </u><br>            <u>DEROGATORY RACIAL COMMENTS, JOKES AND RIDICULE </u>

Despite Defendant Timothy Maloney's apparent satisfaction with Plaintiff's work

performance,  the Plaintiff in the Fall of 1998 began to believe that Maloney's continuing abusive

and intemperate treatment of her in private was related to her gender, race and/or national origin.

Plaintiff testified that Maloney had asked her what were her "colors". In response, Plaintiff asked

him what he meant and he said "...you know , the colors of your race". Plaintiff asked Officer

Maloney if he had a problem with her race, and he said, No but he stated he did have a problem

with black people.  Maloney explained that he had gone to Philadelphia once with some friends

and that "niggers" mugged him for no reason. Plaintiff again asked him if he was sure he didn't

have a problem with Hispanics and he said he didn't but started laughing and asked her why

Puerto Ricans hang the Puerto Rico flag on their rear view mirror.  Plaintiff explained they do it to

show pride in their country. Maloney then remarked , "If their so proud then how come they don't

stay in their country. (See Exhibit "J", Plaintiff's EEOC Charge  pp 2-2; See also Exhibit "A" pp.

42-44).

In the summer of 1999, Plaintiff responded to an automobile accident involving a German

couple.  Apparently, Sgt. Apgar had taken the German couple home after the accident and the

---

The Exhibit "G" pictorial/cartoon titled "It's not my fault".  He claimed never to have seen the
pictorial cartoon titled "Pennridge First Female Set Retire". (See Blake Dep. Tr., Ex. "I" pp. 29-
30).

couple had asked Sgt. Apgar to "thank the nice colored girl" referring to the plaintiff.  Sgt. Apgar, finding the comment humorous returned to the station and made a point to let the other officers know of the comment. Plaintiff was humiliated when everyone in the room laughed and chuckled. Plaintiff became the object of jokes for days when the comment was repeated around the station house by the other officers who referred to Plaintiff the "nice colored girl." According to the Plaintiff, everyone in the room laughed and chuckled about it for a days. The comment was repeated around the station house by the other officers who referred to the Plaintiff as the "nice colored girl."  (See EEOC complaint Ex. "J"; see also Exhibit "A" pp. 102-104).

Another incident occurred again in the Summer of 1999. Plaintiff became a subject of racial jokes regarding her Puerto Rican ancestry after an incident where Plaintiff responded to a noise complaint at a Hispanic residence.  Someone in the residence told plaintiff that she was "sell-out" for not defending Puerto Ricans". The comment then became a recurring joke that the Plaintiff was a "sell-out to her race".  (See EEOC complaint,  p. 8, Ex. "J"; see also Ex. "A"pps. 106-107).

### PLAINTIFF WAS REPEATEDLY SUBJECTED TO INCIDENTS OF _____ SEXUALLY OFFENSIVE AND HUMILIATING COMMENTS AND JOKES

_____There was no shortage of offensive sexual harassment and hostility at Pennridge by Officers of every rank and position. On July 25, 1999, after plaintiff had finished her shift, she noticed Sgt. Blake looking at a framed picture on Officer Rickabaugh's desk.  The frame contained a pictorial/cartoon[4] depicting Plaintiff and officers from her platoon. Plaintiff recalled that the cartoon depicted her seated at her desk with a bubble containing a comment, "I'll show

---

[4]This has not been produced as an exhibit because the Plaintiff does not have possession and control of the cartoon and the and Defendants claim to not know of its whereabouts.

9

Pennridge Regional who Madeline Cruz is.  Where is my new locker room?"  Officer Brian

Rickabaugh's face was depicted on a male body which was nude from the waist down. Officer

Burke  was also in the cartoon, stating "Merry Christmas."  (See Exhibit "A" pp. 63-64.)  The

cartoon/pictorial was known to Lieutenant William Sutton.  Pennridge Administrative secretary

Rosemary Wheatly approached Lt. Sutton and suggested that he take a look at the cartoon because

"he would not be pleased." (See Exhibit "L", Lt. Sutton's Dep. Tr., pp. 73-74). Lt. Sutton

admitted that he was not pleased.  Lt. Sutton described the missing cartoon as a cutout of a black

and white photograph of Madeline Cruz's face.  It also contained the face and head of Officer

Brian Rickabaugh.  The cartoon had male genitalia pasted on it. After seeing the cartoon, Lt.

Sutton expressed to Sgt. Blake that he did not want to see anything like the cartoon pictorial

around the station house.   Lt. Sutton indicates that he also gave the same lecture to Sgt. Apgar..

(See Ex. "L" 73-79).  .

        Lt. Sutton testified that except for talking to Sgt.' Apgar and Blake and later with

Madeline Cruz, he did not investigate who created the cartoon.  No investigation was conducted

and no written reprimands were issued.  (See Ex."L" pp. 82-83).

        Another incident involved a prank phone call to Plaintiff. Some time after Plaintiff

returned to work from her injury, she listened to a telephone voice message created by  coworkers

pretending to be a lawyer who wanted to speak with Plaintiff in reference to a client.   The lawyer

was accusing plaintiff of touching his clients private parts while he was in custody of Officer

Cruz.  Plaintiff reported the voice message to other officers (including a Sgt. Apgar, Officer Brian

Pfaff and A.J. Burke. Plaintiff learned it was a prank when the officers started laughing and

commenting  that they just wanted to see how she would react. (See Exhibit "A" pps.73-76).

Sometime in March 1999, Sgt Rodney Blake (while in the squad room and in the presence of other officers) stated that he had seen a female police officer from Hatfield Twp. investigating an accident in Hatfield. Sgt Blake referred to the Hatfield officer as a friend of Plaintiff's and asked Plaintiff what was going on with the Hatfield Officer and her department. Sgt. Blake then said (in front of the other officers) that "...the guys would have to keep an eye on me when I was in Lieutenant Sutton's office, so that I wouldn't 'do' the Lieutenant like my friend in Hatfield did.". (See EEOC charge, Ex"J' p. 6; see also Ex. "A" 84-86.) Plaintiff did not immediately complain about the comment however, she complained in a later interdepartmental memo to Sgt. Apgar dated September 9, 1999 (See Exhibit "K" Bates stamped p. 188)[5]. Sgt. Blake responded in writing to Plaintiff's complaint. Blake contended that he recalled asking plaintiff if she knew anything about an allegation regarding a Hatfield Township female officer's suspension. Sgt. Blake recalled Officer Cruz advising him that it was that officer's personal life. Blake wrote in his responsive memo that he spoke with Officer Karcher (who was supposed to have been present when he made the comment) and that Officer Karcher did not recall him making the comment. Sergeant Blake in essence pleaded ignorance and/or lack of recollection as to the comments. (See Sgt. Blake's memo to Chief Randall Dilling Ex. "K", Bates stamp p. 73.)

 Officer Harry Hallman[6] was deposed on January 29, 2003 and questioned as to whether he recalled Sergeant Blake making the alleged comment that "...officers would have to keep an eye

---

[5]To easily identify documents during discovery Plaintiff number stamped documents at the bottom right hand corner. The reference "Bate" is the manufacturer of the number stamp. The pages are in chronological order but not all numbered documents are attached. Thus there are gaps.

[6]Officer Hallman has been a Pennridge Police Officer since its creation in 1992. (See Hallman Dep. Tr. Exhibit "B" p.5).

on me(Officer Cruz) when I was in Lieutenant Sutton's office, so I wouldn't 'do' the Lieutenant like my friend in Hatfield did".  Officer Hallman testified he was present in the squad room  when the comment was made. Officer Hallman recalled Sgt. Blake saying that he was in Hatfield and saw an Officer Robinson. Blake alluded to the fact that he would perhaps keep an eye on Plaintiff so that she doesn't do the same thing that Officer Robinson did with the Lieutenant from Hatfield Township, pertaining to sexual activity on duty.  Officer Hallman testified that he was aware that a female Officer from Hatfield was having sexual relations with a Lieutenant from Hatfield. Officer Hallman was asked whether he construed it as offensive, and he responded "I would imagine if I was Madeline Cruz I might take it offensively."  He also indicated that Madeline Cruz did indicate her displeasure about the comment at the time.  (See Exhibit "B" Hallman Dep. Tr. pp. 19-22 ).

On another occasion, around August 10, 1999, plaintiff called home to check her voice messages and noticed a call from Chief Dilling.  She called the station house and asked for Chief Dilling. Officer Patrick  Karcher answered the phone and told her Dilling was not around. Plaintiff inquired if Officer Karcher  knew why the Chief wanted to speak with her.  Officer Karcher stated in reply "maybe he wants a little something from you."  Karcher  then said "just because he's old doesn't mean he doesn't want some."  (See Exhibit J, EEOC charge, p.9).  At a later time, plaintiff complained to Sergeant Afgar about, among other things, Officer Karcher's remarks.  Officer  Karcher was required to respond in writing to Chief Dilling regarding plaintiff's allegations about his comments.  Officer Karcher in writing denied having made such comments. (See Exhibit K, Bates stamp #75.)  Officer Harry Hallman testified that he was present when Officer Karcher  made the comments and understood Officer Karcher's comment in a similar way

12

that Officer Cruz understood it, namely, that it was a sexual joke.  (See Exhibit "B", pp. 16, 17).

Exhibit A to Plaintiff's second amended complaint is another example of the type of sexual harassment that plaintiff endured while at Pennridge. (a copy of the pictorial/cartoons is attached with Exhibit "G").   Brian Rickabaugh was deposed on November 11, 2002 and admitted to seeing pornographic pictorial on the humor board and indicated that Officer Tim Maloney is depicted in the middle.  His face is on the penile enlargement section of the Exhibit. He indicated that on the bottom "Surgery Center for Men" has a cutout of plaintiff's face with that of Brian Pfaff's face.  (See Exhibit "N", Rickabaugh Dep. Tr., pp. 17, 18.). The picture was also placed on the humor board and is apparently an advertisement from a pornographic magazine for, among other things, penile enlargement. Lt. Sutton testified that the pictorial was admittedly inappropriate and should result in disciplinary action to the creator.  (See Exhibit "L" p. 85.)  Lt. Sutton testified that he believed that the creation and posting of such a cartoon would violate Pennridge's Policy #311 entitled "Statement Against Harassment".  (See Exhibit "L", pp. 88-89; see also Pennridge Police Department Policy #311 attached as Exhibit "M".)

Officer Brian Rickabaugh had on an occasion asked Plaintiff why are you so moody and asked whether "it was my time of the month". (See Ex. "J" EEOC charge page 9).

Officer Maloney's expressed displeasure that Plaintiff  needed certain police equipment designed for women officers. One such piece of equipment was a belt holster  known as a "Sally Brown" belt which held a smaller handgun.   Officer Maloney admitted that he had called Plaintiff a "bitch" explaining that she has "... bitched about her gun, she got a different gun, she bitched about her holster, she got a new holster,  she has bitched about her vehicle,  she was assigned a new vehicle, she has bitched about her duty belt,  she got a new duty belt.  He followed

13

up by saying 'because she is a Hispanic female it does not appear as though they will do anything'.". (See Exhibit "K", Memo dated 9/22/99 from Maloney to Apgar Bate stamp pps 77-78).[7]

Plaintiff complained sometime in early September 1999 that she came to work at 6:00 a.m. and her desk was a mess. The male officers had left crumbled paper on her desk, candy wrappers, her desk accessories had been switched, someone had gone into her desk drawer and she noticed that her papers had been rummaged through and switched from their normal place. She had a tin box where she kept personal items such as tampons and lipstick which had been disrupted and used chewing gum had been placed in the tin box. (See Exhibit J, EEOC charge, p.10).

### PLAINTIFF'S FIREARMS QUALIFICATIONS

Chief Dilling. Lt. Sutton and Sgt. Apgar all claimed concern about Plaintiff's use of a firearm. It became one of the cited reasons for Plaintiff's employment termination noted as unsatisfactory level of firearms performance and proficiency. (See exhibit K, Bates stamp numbers 94 and 95.) Firearms qualification is governed by Pa. Code Section 203-11, Re: Firearms Qualifications. The Pennsylvania Code states:

> Except as provided in subsection B, persons who are to be employed as police officers by police departments within this Commonwealth from December 21, 1996 must achieve a minimum qualifying firearms score of 75%.

Sergeant Rodney Blake was actively involved in Plaintiff's her firearms qualifications. Sergeant Blake is certified to qualify officers in firearms. Sergeant Blake testified that plaintiff, as

---

[7]The memo was a response to Plaintiff's written allegations of Harassment made by Officer Cruz against, among others, Tim Maloney in her 9/9/99 memo Ex. "K" Bate stamp pp 64-68).

an intern, qualified with a score of 88%. (See Exhibit C, pp. 7-9). Plaintiff was again qualified in individual firearms on July 19, 1999. She was qualified by Certified Firearms Instructor, Officer Patrick Karcher, who gave her a handgun score of 79.3%. Officer Karcher indicated on the report that Officer Cruz's score was acceptable for qualification. (See Exhibit K, pp. 109, 110). With respect to shooting a handgun from a distance of 3 or 7 yards, Cruz attained a score of 94.6%. Officer Carter indicated that while using a 12-gauge shotgun, Officer Cruz did a very good job. (See Exhibit K, pp. 111-112.) Plaintiff's last qualifying score prior to her discharge was a passing 85.6% according the testimony of Sgt. Blake. As of 10/25/99 he had no concerns with her shooting, other than he thought that she, as well as all other officers should be put through stressful shooting scenarios, but he said that could come with time.

On plaintiff's final duty firearms report dated October 25, 1999, Officer Patrick Karcher states "Officer Cruz had improved with her shooting and she appears to be comfortable with her weapon. This instructor recommends that she continue to practice at the 15 and 25 yard markers, and she shoots very well up close. (See Exhibit K, Bates #117, 118.)

The record does not support Chief Randall Dilling's comment in his memo terminating plaintiff's employment that she had an "unsatisfactory level of firearms performance and proficiency". His comment that this issue is ongoing and has not been satisfied during her probationary period is not supported by the record.[8]

## PLAINTIFF'S INVOLVEMENT WITH POLICE WHILE ON VACATION IN PUERTO RICO

---

[8]It is interesting to note that no officer in Pennridge history has ever had to use his firearm in the line of duty. The only use of a firearm has been to put down an animal such as a deer along the highway. (See Exhibit D, p.29.)

15

Although plaintiff had made a complaint about working conditions at Pennridge prior to September of 1999, it is clear from the records that September of 1999 began Officer Cruz' downhill spiral toward termination. The timing is highly suspicious. When plaintiff was hired on September 23, 1998 as a full time officer, pursuant to Pennridge Policy number #309, she was on probation for a period of one year. This is true of all new officers hired at Pennridge. As a consequence, by September of 1999, Officer Cruz' probationary period was coming to an end, at which time the Board of Commissioners, following the recommendations of Chief Randall Dilling, as well as her other superior officers, Lt. Sutton, Sgt. Blake and Sgt. Apgar would have to determine whether she would be kept with the department. (See Exhibit K, Bates stamped 148, 149.) As of September 27, 1999, Chief Randall Dilling recommended to the Board of Commissioners that Plaintiff's probationary status be extended for a period of weeks, due to the fact that she had been injured on duty for a seven week period, and they were unable to evaluate her performance in that period of time. The Board extended her probationary period to November 11, 1999. (See Exhibit K, Bates #148, 149).

After Plaintiff put in writing (at the direction of Sgt. Apgar) her complaints of harassment over the past year Defendant began to document alleged performance problems. Plaintiff was required to put her complaints in writing after defendant Officer Timothy Maloney filed a formal written complaint against Plaintiff to Sgt. Apgar. The complaint regarded what he termed "unbecoming conduct." Maloney's memo (attached as Exhibit K, Bates #57) indicates that Officer Cruz had been on vacation in Puerto Rico from August 22-28, 1999 and was apparently stopped by Puerto Rican Police. Officer Timothy Maloney alleges that plaintiff got angry with a police officer in Puerto Rico and got into a "verbal argument." Officer Maloney indicated that

16

Plaintiff's conduct violated Chapter 3 of the Pennridge Police Department Guidelines, Section 303 which states that "Officers at all times whether on duty or off, shall conduct themselves in a manner as to reflect favorably on the department". Another concern raised by Maloney's memo was that she came back to work and told several employees that she was cited in Puerto that "she appeared to "gloat" about the stop. (See Exhibit K, Bates #57.) Although Officer Maloney's memo is undated, he testified the memo would have been around August 28, 1999, a time period during which he agreed his relationship with Madeline Cruz was "argumentative." (See Exhibit D, p. 65)

Officer Maloney testified that he was present when Madeline Cruz spoke to two other officers about the Puerto Rico incident and he overheard her say she had gotten angry with a police officer and had gotten into an argument with him. Officer Maloney admitted to not knowing the details of what the argument was about. (See Exhibit D, pp. 71,72.) Officer Maloney testified that he believed it's unbecoming conduct of a police officer if, either on duty or off duty, they get into argument with another police officer. He said "that's my feeling." He again admitted to having no specific knowledge or details about what her argument was about , and didn't ever come to an understanding of what it was at a later time. (See Exhibit D, pp. 72-73.) When questioned about what he meant by "gloat" he indicated that it meant merely that she told it in front several other people, himself, Officer Decembrino and Officer Bartholomew.

Maloney testified that no asked him for details nor questioned him about the incident. He claims to have been unaware that Chief Dilling used the incident as a basis for her termination. (See Exhibit D, p. 74.)

Sgt. Apgar testified that he was present when Officer Cruz was telling the other officers

about the run-in with police in Puerto Rico.  When Officer Apgar was pressed for details about what he overheard Officer Cruz say he admitted that he did not recall and admitted that he did not approach her to ask questions about the incident. (See Exhibit H, pp. 61, 62.). Sgt Apgar said that he forwarded Officer Maloney's memo to Lt. Sutton.

When Madeline Cruz learned about Maloney's memo (as well as his memo relating to missing patrol log/incident reports) to Sgt. Apgar she felt compelled to voice her concerns about her overall treatment and issues of "harassment."   As a consequence of that meeting, St. Apgar issued a memo to Officer Cruz ordering her to put in writing by September 19, 1999 the following:  1) a written explanation as to the missing patrol logs/incident reports; 2) provide a written explanation of an incident that took place in Puerto Rico while on vacation and 3) place in writing her charges of harassment by Pennridge Officers.  She was directed to include the names of all officers and specifics as to the behavior and incident that she felt substantiated her allegations of harassment. (See Exhibit K, Bates stamps pps. 55, 56.)

Madeline Cruz was ordered to produce copies of the Puerto Rico citations together with the names of the police agency and court jurisdiction involved.  Plaintiff told him she didn't have the citations because she paid for them while in Puerto Rico didn't know what jurisdiction issued the tickets.  Plaintiff responded to Sgt. Apgar's by written memo dated September 9, 1999 in which she addressed a number of her complaints of harassment. (See Exhibit "K" pps. 64-68)[9]

Relative to her traffic violation in Puerto Rico, Plaintiff explained that she was in a suburb of San Juan and was stopped by local police for a minor traffic violation.  She explained that there

_____

[9]The memo is actually misdated.  The memo is stamped received September 20 and was due on the 19th, therefore, Sgt. Apgar admitted that the dating is incorrect (see Ex. H, pp. 67, 68).

was a "verbal exchange" between a passenger in her vehicle and the police officer.  Plaintiff

immediately addressed her passenger's conduct concerning their behavior.  She indicated that the

officer in Puerto Rico was appreciative as to how she was addressing her passenger's conduct.  A

second Puerto Rican officer was apparently distraught concerning her passenger's conduct and, as

a result she received three seatbelt violations and a turn signal violation.  Because she was not

going to be in Puerto Rico she made arrangements to have the citations honored by a friend in

Puerto Rico.  She explained that she did not have the citations, she couldn't provide them as

requested and they would have no reflection on her Pennsylvania Operating status.  Plaintiff

complained that Maloney took things out of context and exaggerated the situation.  She said that

Officer Maloney questioned her about the police and she explained the circumstances and the fact

that she never identified herself as a member of Pennridge Police Department and never gloated

nor was disrespectful.  Plaintiff never attempted to influence the decision of the issuing officer by

showing police identification.

Notwithstanding Plaintiff's explanation of the incident Sgt. Apgar, was unwilling to accept

her explanation of the incident and persisted in insisting that she produce the citations.  Madeline

Cruz did a memo dated October 8, 1999, putting in writing that she was unable to supply a copy

of the four citations. She explained that she had made several attempts to obtain copies of the four

citations with negative results. (See Exhibit K, Bates stamp p 209).

On September 22, 1999,  Sgt. Apgar recommended to Lt. Sutton that plaintiff be cited for

insubordination and recommended disciplinary action.  His recommendations arose from

Plaintiff's failure to provide the four traffic citations.  On September 25, 1999,  Lt. Sutton did a

memo to Chief Dilling concurring that plaintiff be issued a letter of reprimand for failing to obey

19

orders to produce documentation of the citations in Puerto Rico (see Exhibit "K", Bate stamp p.

195).  On October 1, 1999, Chief Dilling issued Plaintiff a written reprimand as recommended by

Lt. Sutton and Sgt. Apgar for violation of Pennridge Manual, Section 330, "Insubordination" and

Section 341, "conformance to law".  The charges arose from her failure to address satisfactorily

the issues in Puerto Rico (see Exhibit K, Bates #194).

## LATE OR MISSING PATROL LOG/INCIDENT REPORTS

One of the reasons cited by Chief Dilling for Plaintiff's termination was her written

reprimand dated 10/1/99 relating to failure to file a patrol log/incident report. (Exhibit "K"Bate

stamp p. 94-95). Maloney complained in a written memo that he was unable to find Plaintiff's

Patrol Log because it was not done and that several reports were not logged in the Patrol Log

including a school bus accident that he claimed to be unaware because there was no record.

(Exhibit "K"Bate stamp p. 191). Plaintiff was required by Sgt Apgar to provide a written

response. (Exhibit "K"Bate stamp p. 184-185). Plaintiff provided her response with her 9/9/99

memo (true date is 9/19/99) attached as Exhibit"K" Bate stamped  p. 64-68. Plaintiff explained

that she advised Offs. Maloney and Bartholomew of her shift activities and that her incident

reports were placed in the "incomplete bin" which was common procedure in the department. In

fact, Lt. Sutton testified that if a shift did not permit enough time to complete an incident report

then generally the officer would come back the next shift. He indicated that no overtime was

authorized to complete reports.(See Ex. "D" pg 34-35). According to the testimony of Sgt. Apgar,

incidents reports were routinely done late by all officers. Attached hereto as Exhibit "K" and Bate

stamped pgs. 82 and 83 is a  list of late and incomplete incident reports during the month of

September 1999 by many male officers not just Plaintiff.  Yet it was only Plaintiff, the only

20

female officer who received a written reprimand. (See also Ex. "H" pgs. 84-87)

Plaintiff insisted that the reports were placed in the "incomplete bin" as per her training and that if Maloney had a genuine concern Plaintiff was present on 9/8/99 during Maloneys role call and for an hour thereafter in the squad room to answer his concerns. Plaintiff in her response called into question  Maloney's true motivations because he was present in the squad room when she addressed the bus accident and that she was working overtime on the accident. (See Ex. "K" Bate stamp pgs. 64-68). Maloney further complained that Plaintiff did not respond to a routing slip asking why the reports were not done yet his routing slip checked off box "FYI Need not Return".  (See routing slip attached as Ex. "K" Bate stamp p. 193).  Plaintiff testified that she does not believe Maloney could not find her Patrol Log. (Exhibit "A" p. 161-162). Plaintiff's explanations were not given appropriate credence and she was reprimanded.

## LATENESS OF MAY 19, 1999

Another incident which Chief Randall Dilling cited to claim an overall unsatisfactory and unacceptable disciplinary history by plaintiff was a written reprimand issued by Sgt. Apgar dated May 26, 1999 for violating Section 305 of the Pennridge Manual regarding "Reporting for duty". (See Exhibit "K", Chief Dilling's memo to Plaintiff dated 11/9/99, Bates Stamp pps 94, 95). Sgt. Apgar reported that plaintiff was two hours late for work. The lateness on May 19 was the result of plaintiff misreading her schedule. Sgt. Apgar recommended punitive action not to exceed a written reprimand as corrective action. He stated he believed that Officer Cruz' overall performance had continued to improve and he did not believe that this incident was either an intentional act or situation that would occur again. (See Exhibit "K", Bate stamp pps 39-40). Notwithstanding Sgt. Apar's alleged understanding of the problem, plaintiff received a written reprimand. Sgt. Apgar was deposed on December 4, 2002 and questioned about a his quarterly evaluation of Plaintiff dated June 17, 1999. The evaluation indicated that plaintiff was meeting all standards and the only area she needing improvement was "On time and prepared for assignments/duty". Sgt. Apgar recalled that the reason improvement was needed dealt with her two-hour shift lateness which (at the time of his deposition) he believed was an oral reprimand. He was asked as of that time whether, other than the two-hour incident, he had any problems with her being on time or prepared for work assignments. He recalled that he did not. He indicated that other than the incident where she misread the schedule she did not have any other problems with being on time or prepared for work assignments. (See Exhibit "H", p. 48). The written reprimand although not considered a problem by Sgt. Apgar at the time he issued it, was later

22

blown out of proportion and alleged to be a basis for her discharge.  Plaintiff complained in her

EEOC complaint  (Exhibit "J",  page 7,) that officers Pfaff, Karcher and even Sgt. Apgar had been

late many times without receiving a reprimand. It clear that these minor episodes which were

routinely not a subject of reprimand for male officers were disparately used as the basis for

Plaintiff's termination in direct retaliation for her complaints of discrimination.

### PLAINTIFF PERFORMANCE EVALUATION REPORTS

In his termination memo to Plaintiff, Chief Randall Dilling indicated Plaintiff had "Overall

unsatisfactory Performance Evaluation". (See Exhibit "K", Chief Dilling's memo to Plaintiff

dated 9/ 9/99, Bates Stamp pps  94, 95). As previously addressed in this brief the Plaintiff was

originally evaluated for work performance by Officer Maloney who indicated that her

performance was "wonderful" and recommended her for full time employment. Officer Pfaff was

Plaintiff's FTO early after she was hired full time and testified  her performance was

"average...same as any other new officer." He testified that nothing stood out as a problem. (See

Dep Tr. of Brian Pfaff attached as Exhibit "E", pp. 11-14).

Sgt. Apgar did subsequent evaluations which are attached with Exhibit "K" and Bate

Stamp pps 248-260. In her evaluation by Apgar dated 3/29/99 he checked off five areas where he

thought Plaintiff needed improvement. He wanted Plaintiff to be more aggressive and needed

improve on completing assignments and reports in a timely manner. He states she displays a good

attitude, enjoys the job and ask questions to improve her grasp of the work.  Apgar indicated she

followed directions and gets along with other officers. He indicated that the areas she needed

improvement in were to be expected for any employee.  (Exhibit "K" and Bate Stamp pps 249-

250).

23

Plaintiff's next evaluation was also completed by Sgt. Apgar and is dated 6/17/99 and is attached with Exhibit "K" and Bate Stamp pps 251-253. The evaluation demonstrated growth and improvement. Only two areas were checked off as needing improvement and one of the areas was about being on time which related to the event when Plaintiff misread her schedule and was two hours late. Apgar reported that she needed improvement in patrol techniques and to self initiate activities. She displayed very good interview and interrogation technique with subjects –uncommon in new officers. He indicated she continued to work hard and make good progress. The 6/17/99 evaluation stated in conclusion, "Overall, I am happy with her progress and I am confident she will continue to work toward making any improvements needed. (See Exhibit "K" and Bate Stamp pps 251-253). Of particular note is his comments regarding interpersonal relationships. Sgt. Apgar indicated he saw no problems. She maintains good working relationship with her co-workers.

Plaintiff's next evaluation was on 9/20/99 days making her written complaints about harassing conduct of other officers. Not coincidentally her evaluations all of a sudden included a critique of her interpersonal relationships and conduct. Apgar stated she had good working relationship with co-workers but problems have developed with others which require Officer Cruz proper reactions to correct. Her evaluation went downhill and included five alleged areas checked needed for improvement. (See Exhibit "K" Bate Stamp pps 254-257). Plaintiff's final evaluation report dated 11/4/99 plummeted. Sgt. Apgar's criticism were clearly in retaliation for her complaints of discrimination. He stated with respect to interpersonal relationships and conduct

This is the area that causes perhaps the most concern to me... No where is it written in police work that you must like your coworkers, but it is imperative for the professional operations of a

24

> police department that personalities be put aside for the tour of duty... In discussions with Officer Cruz I know she understands the chain of command, but fails to accept it. Like it or not, a police department of our size is a paramilitary organization and the protocols are the same. Based on rank or seniority, not all officers are on the same standing and this seems to be a problem... This is one of the few jobs that in which complacency or incompetence will get someone killed, and I believe that it is in this vein that her fellow officers have acted as they did, and not based on any other reason. Barring one other officer, Officer Cruz is junior to all of the other members of her platoon and insubordination will not be tolerated. As articulated above, personalities and attitudes have no place in this profession and stable and cohesion unit is a strict mandate.

(See Exhibit "K" Bate stamp pages 99-103). Clearly Sgt. Apgar was sending a clear message that Plaintiff's complaints related to discrimination would not be tolerated in the department. Additionally, it is significant to point out that Sgt. Apgar included a lengthy critique in this evaluation of Plaintiff's fire arm qualification. Reading Sgt. Apgar's critique, the fact that Officer Cruz had successfully qualified was essentially dismissed as irrelevant.

It is also extremely significant that despite Plaintiff's discrimination complaints against Officers in her department none of their Performance Evaluations were affected by Plaintiff's claims. For example, Officer Maloney who was the subject of such complaints, had undisputed problems met standards in every category in his yearly performance evaluation dated 7/30/00. Not a single comment was made or raised about inappropriate conduct or problems with interpersonal relationships and conduct. (Performance evaluations of Officers, Pfaff, Maloney, Rickabaugh, Bartholomew, Blake, Apgar and Sutton are attached as Exhibit "O"). This is clearly evidence of disparate treatment. For all of the foregoing reasons, Plaintiff respectfully submits that Defendant's Motion for Summary Judgment should be denied.

## I.    LEGAL ARGUMENT

### A.    STANDARD OF REVIEW

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, and admissions on file fail to demonstrate a genuine issue of material fact so that the moving party is therefore entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c). In other words, summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party. _Anderson v. Liberty Lobby Inc.,_ 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry the burden of persuasion at trial.  _Celotex Corp. v. Catrett,_ 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986)  . The nonmoving party must then go beyond the pleadings and, by affidavits, depositions, answers to interrogatories, and admissions on file, designate facts showing that a genuine issue of material fact remains for trial. _Id._ at 324, 106 S.Ct. at 2553. The nonmoving party must establish the existence of every element necessary to its case, on which it bears the burden of proof. _Miller v. Indiana Hospital_, 843 F.2d 139, 143 (3d Cir.1988).

 "Facts that could alter the outcome are 'material', and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." _Horowitz v. Federal Kemper Life Assurance Co.,_ 57 F.3d 300, 302 n. 1 (3d Cir.1995).

The Plaintiff's evidence in the case sub judice establishes that there are material facts which create a genuine dispute from which a rational person could conclude that Plaintiff has met her burden of proof and should prevail on her claims.

**B.    PLAINTIFFS EVIDENCE SUPPORTS A FINDING OF SEVERE AND PERVASIVE SEXUAL HARASSMENT WHICH CREATED AN ABUSIVE AND HOSTILE ENVIRONMENT**

Under Title VII of the Civil Rights Act of 1964, "[i]t shall be an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §§ 2000e-2(a)(1).

The United States Supreme Court has repeatedly "...made clear that although the statute mentions specific employment decisions with immediate consequences, the scope of the prohibition " 'is not limited to "economic" or "tangible" discrimination,' " *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson, supra,* at 64, 106 S.Ct., at 2404), and that it covers more than " 'terms' and 'conditions' in the narrow contractual sense." *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 78, 118 S.Ct. 998, 1001, 140 L.Ed.2d 201 (1998).

In *Meritor,* the Supreme Court held that sexual harassment so "severe or pervasive" as to " 'alter the conditions of [the victim's] employment and create an abusive working environment' " violates Title VII. 477 U.S., at 67, 106 S.Ct., at 2405-2406 (quoting *Henson v. Dundee,* 682 F.2d 897, 904 (C.A.11 1982)).

Workplace conduct is not measured in isolation; instead, "...whether an environment is

27

sufficiently hostile or abusive" must be judged "by 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Faragher v. Boca Raton*, 524 U.S. 775 at 787-788, 118 S.Ct. 2275 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). In order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. *Harris supra.* 510 U.S., at 21-22, 114 S.Ct., at 370-371. Courts are to determine whether an environment is sufficiently hostile or abusive by "looking at all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening  or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.,* at 23, 114 S.Ct., at 371.

_____In the case sub-judice, looking at all the circumstances (the frequency and severity of the discriminatory conduct) it is clear that a sexually objectionable environment must existed at Pennridge Police Department which was both objectively and subjectively offensive and one that a reasonable person would find hostile and/or abusive. Examples of the hostile work environment evidence Plaintiff's claims:

- ■	Sexist, pornographic, demeaning and humiliating pictorial/cartoons depicting Plaintiff alongside male officers with exposed genitals with written comments "You've got to be shitting me if this is the new Regional"
- ■	Sexist, pornographic, demeaning and humiliating pictorial/cartoons depicting Plaintiff in pornographic advertisements;
- ■	Sexist, pornographic, demeaning and humiliating pictorial/cartoons and referring to Plaintiff as "You fucking bitch.  I'll show you hurt." and/or  "Pennridge Regional First Female Set

28

to Retire.";

■     Plaintiff was repeatedly subjected to incidents of sexist, derogatory racial comments, jokes and ridicule including being asked about her "colors" of her race and being told by her fellow Officer that he only had  problems with "black people" and/or "niggers" but wondering why if Puerto Ricans are so proud "...they don't stay in their own country";

■     Repeatedly being the object of racist humor by being referred to Plaintiff as the "nice colored girl" and a "sell-out to her race";

■      Receiving prank call accusing Plaintiff of touching a mans "private parts" in the course of her duties;

■     A Sergeant telling her that "...the guys would have to keep an eye on me when I was in Lieutenant Sutton's office, so that I wouldn't 'do' the Lieutenant";

■     Being asked by a fellow officer why she was so moody and asked whether it was her time of the month;

■     Suggesting that the Police Chief had telephoned the station looking for sex from Plaintiff and the comment "Maybe he wants a little something from you...just because he's old doesn't mean he doesn't want some";

■     Being ridiculed and referred to as a bitch for requesting certain police equipment designed for females;

■     Being routinely belittled and treated in a condescending fashion by her Field Training Officer and referred to as the "biggest fucking bitch in the department";

■     Being asked if she planned to marry and have children during her interview and how she felt that would affect her career;

■     Male officers trashing her desk and going through her personal items and leaving chewed gum in a tin where Plaintiff stored tampons and lipstick and

■     When Plaintiff complained that she was subjected to both racial and sexual harassment she suddenly and dubiously became the subject of written reprimands, poor evaluations and conduct complaints which lead to her termination.

Defendant argues that the conduct as evidenced above would not lead a reasonable fact finder to conclude Title VII was violated. Defendant argues that the conduct was merely offhand comments and isolated incidents which may be offensive but did not constitute a hostile work environment. **No person should have to work in an environment such as Plaintiff put up with at Pennridge.  What Plaintiff endured is precisely the type of environment and conduct Title VII was enacted to prevent.**  When the workplace is permeated with discriminatory intimidation,

29

ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) .

Plaintiff has produced sufficient evidence to establish a prima facie hostile work environment claim. Plaintiff's has presented evidence that she endured severe and pervasive harassment that altered the conditions of her employment and created an abusive working environment. The Plaintiff has presented evidence that her claims were known to all of her supervisors from her Chief Dilling down to  the Lieutenant Sutton and Sergeants Apgar and Blake. Instead of action being taken to correct the hostile environment her employer retaliated against her and terminated her employment.

### DEFENDANT MAINTAINS PLAINTIFF CANNOT PROVE THAT ANY OF THE AFOREMENTIONED INCIDENTS OCCURRED BECAUSE SHE WAS A WOMEN.

Plaintiff simply responds that the acts speak for themself. The complained of conduct is of a sexual nature, its pornographic, demeaning and humiliating and directed at a women by men. The comments are specifically directed at Plaintiff because she is a women. If the harassing comments and pictorials/cartoons were directed to a male they would then take on a homosexual meaning. Any reasonable person will understand that harassing conduct was directed and intended for Plaintiff because of her gender (because she is a women). It is because of her gender that the conduct the Plaintiff the intended meaning.  were directed to by men.

### PLAINTIFF'S EMPLOYER SHOULD BE LIABLE FOR THE ALLEGED HARASSMENT

Plaintiff is confident that when a jury of her peers is presented with a chronological history

of Plaintiff's work performance together with the detailed evidence of the harassment she endured

at Pennridge-- that they will come to no other conclusion but that stated reasons for her discharge

were a pretext to cover the retaliatory discharge for her complaints of harassment.

The US Supreme Court stated in *Faragher v. Boca Raton*, 524 U.S. 775 at 807-808, 118

S.Ct. 2275 that:

> In order to accommodate the principle of vicarious liability for harm caused by
> misuse of supervisory authority, as well as Title VII's equally basic policies of
> encouraging forethought by employers and saving action by objecting
> employees, we adopt the following holding in this case and in *Burlington
> Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633
> (1998), also decided today. An employer is subject to vicarious liability to a
> victimized employee for an actionable hostile environment created by a
> supervisor with immediate (or successively higher) authority over the employee.
> When no tangible employment action is taken, a defending employer may raise
> an affirmative defense to liability or damages, subject to proof by a
> preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense
> comprises two necessary elements: (a) that the employer exercised reasonable
> care to prevent and correct promptly any sexually harassing behavior, and (b)
> that the plaintiff employee unreasonably failed to take advantage of any
> preventive or corrective opportunities provided by the employer or to avoid
> harm otherwise.

The Court stated that an employer is subject to vicarious liability to a victimized

employee for an actionable hostile environment created by a supervisor with immediate (or

successively higher) authority over the employee. The evidence as outlined in Plaintiff's Counter

Statement of Facts in this brief detailed evidence that her claims were well known to all of her

supervisors from Chief Dilling, Lt. Sutton and Sergeants Apgar and Blake. The supervisors did

little to nothing to prevent and correct promptly any sexually harassing behavior of which they

were aware. Officer Maloney (a major player in creating the hostile environment) was Plaintiffs

FTO and was responsible for evaluating Plaintiff's performance both as an intern and as a

31

probationary employee. Sgt. Blake a superior officer made harassing comments.

Sgt Agar was depicted in cartoons and involved in the humiliating prank phone message.

Plaintiff's supervisory employees were involved in creating the hostile work environment.

Instead of taking action to correct the hostile environment her employer retaliated against

her and terminated her employment.  No affirmative defense is available when the supervisor's

harassment culminates in a tangible employment action, such as discharge, demotion, or

undesirable reassignment. See _Burlington_, 524 U.S., at 762-763, 118 S.Ct., at 2269.

### PLAINTIFF HAS ESTABLISHED A PRIMA FACIE CASE OF DISCRIMINATION

The evidence presented by the Plaintiff demonstrates disparate treatment. Defendant

argues that the Plaintiff cannot prove a prima facie case of gender or racial discrimination because

she cannot prove she performed her job satisfactorily. Plaintiff's Counter Statement of Facts

demonstrates that she had satisfactory performance evaluations until she complained about

harassment. The conduct cited as the excuse for her poor performance evaluations and subsequent

termination  (Puerto Rico police incident; filing late reports and her handgun skills) were all in

reality bogus and the scrutiny and discipline she received was out of proportion top that of the

male officers. Plaintiff was not given due credibility (like the male officers) when she attempted

to explain the Puerto Rico incident and the late reports. No one accepted her written explanation

of the her police stop in Puerto Rico and the incidents were scrutinized and blown out of

proportion. At the same time the male officers were believed and not scrutinized nor disciplined

for the detailed complaints of harassment made by Plaintiff which were verifiable and known by

her superiors. In proportion (disparate), Plaintiffs complaints about harassment by male officers

were far more serious (and constituted a violation of Pennridges Policies) then the Puerto Rico incident. The pictorial/cartoons were noted by Lt. Sutton to be a clear a violation of Pennridge's harassment policy yet there was no investigation as to who created the cartoons. No male officer was disciplined. Nor ever even asked who created the pictorial/cartoons.

In providing written responses to Plaintiff claims of harassment the male officers explanations were accepted without question and no disciplined was issued. The discipline meted out to Plaintiff was far out of proportion (disparate) to that of male officers. Her explanations for late incident reports (the evidence shows it was a department wide problem) were not accepted and she was subjected to written reprimands.

Disparate treatment existed between Plaintiff and the men as to discipline for lateness. Plaintiff complained in her EEOC complaint (Exhibit "K", page 7, Bates stamp p. 297) that officers Pfaff, Karcher and even Sgt. Apgar had been late many times without receiving a reprimand. For further examples of disparate treatment see Plaintiff's Counter Statement of Facts. Plaintiff's received the ultimate disparate treatment–she was terminated and her male counterparts continue to serve as officers.

## SUFFICIENT FACTS EXIST TO SUPPORT A CLAIM FOR DEFAMATION

Defendant Maloney claims that he cannot be liable to the Plaintiff for defamation because what he reported about Plaintiff's incident with police in Puerto Rico and the missing patrol log/incident reports are true. Plaintiff does not agree that Defendants memo is true. To the contrary Plaintiff denies that she "... got angry with a police officer and got into a verbal argument". Plaintiff denies "...that she identified herself as a police officer". Plaintiff denies that she "gloated". Plaintiff also denies that Defendant Maloney "... asked her what happened. (See

33

Defendants Exhibit "O"). Not only are the facts not true but they were never related to Maloney nor to any other Officer.

_____Tim Maloney also falsely complained that he was unable to find Plaintiff's Patrol Log because it was not done and that several reports were not logged in the Patrol Log including a school bus accident that he claimed to be unaware because there was no record. (Exhibit "K" Bate stamp p.191). Plaintiff maintains that she advised Off. Maloney as well as Bartholomew of her shift activities and that her incident reports were placed in the "incomplete bin". Plaintiff insisted that the reports were in the "incomplete bin". Plaintiff questions Maloney's true motivations because he was present in the squad room when she addressed the bus accident and that she was working overtime on the accident. (See Ex. "K" Bate stamp pgs. 64-65). Plaintiff in her response called into question Maloney's true motivations because he was present in the squad room when she addressed that the bus accident and that she was working overtime on the accident. (See Ex. "K" Bate stamp pgs. 64-65). Maloney falsely stated that Plaintiff did not respond to a routing slip asking why the reports were not done. In fact, Maloney's routing slip checked off box "FYI Need not Return". (See routing slip attached as Ex. "K" Bate stamp p. 193). Plaintiff believes and therefore averred that Maloney had actual knowledge of the falsity of his statements and/or with reckless disregard for the truth or falsity of his statements.

The false statements were extremely defamatory because they were understood by Plaintiff's superiors to be true and used by her supervisors as a basis to terminate Plaintiff.

**DEFENDANT MALONEY IS NOT ENTITLED TO A DEFENSE OF QUALIFIED IMMUNITY**

Government officials performing discretionary functions generally are granted a qualified immunity and are shielded from liability for civil damages insofar as their conduct does not

34

violate clearly established statutory or constitutional rights of which a reasonable person would have known. <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Whether an official protected by qualified immunity may be held personally liable for allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action accessed in the light of the legal rules that were '<u>clearly established</u>' at the time it was taken." <u>Wilson v. Layne</u>, 526 U.S. 603, 614 (1999) citing to <u>Anderson v. Creighton</u>, 483 U.S. 635, 639 (1987).  The  <u>Wilson</u> Court further explained that "{t}he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right" <u>Id</u> at 614.

Pennridge had a Policy Manual which was provided to all police officers. That manual contained a provision entitled " Statement Against Harassment" adopted in February 1992. It states in pertinent part "It is the policy of the Department to forbid sexual, racial, ethnic or religious harassment in the workplace." (See Policy Manual Sec. 311 attached as Exhibit "M"). The harassment policy is similar to the statutory rights protected under Title VII and it was not "objectively reasonable for the defendant Maloney to believe that his harassing conduct (as detailed in Plaintiff's Counter Statement of Facts) did not violate such law. Plaintiff incorporates her arguments that the conduct as outlined by Plaintiff was severe and pervasive and crated a hostile work environment of which Defendant was an significant contributor.

### PLAINTIFF CLAIM FOR WRONGFUL DISCHARGE AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### Wrongful Discharge

Generally, an employer "may discharge an employee with or without cause, at pleasure,

unless restrained by some contract." <u>Henry v. Pittsburg & Lake Erie Railroad Company</u>, 139 Pa.

289, 297, 21 A. 157 (1891). "Absent a statutory or contractual provision to the contrary, the law

has taken for granted the power of either party to terminate an employment relationship for any or

no reason." <u>Geary v. U.S. Steel Corporation</u>, 456 Pa. 171, 175, 319 A.2d 174, 176 (1974). The

employer's privilege to dismiss an employee with or without cause is not absolute, however, and

may be qualified by the dictates of public policy.

When a given policy is so obviously for or against the public health, safety, morals or

welfare that there is a virtual unanimity of opinion in regard to it, that a court may constitute itself

the voice of the community in so declaring. There must be a positive, well-defined, universal

public sentiment, deeply integrated in the customs and beliefs of the people and in their conviction

of what is just and right and in the interests of the public weal. See <u>Mamlin v. Genoe</u>, 340 Pa. 320,

17 A.2d 407 (1941), <u>Lurie v. Republican Alliance</u>, 412 Pa. 61, 192 A.2d 367 (1963), and <u>Hall v.</u>

<u>Amica Mutual Insurance Company</u>, 538 Pa. 337, 648 A.2d 755 (1994),

 340 Pa. at 325, 17 A.2d at 409.

Plaintiff suggests that the policies of Title VII against harassment on the basis of sex

and/or race positive are  "... well-defined, universal public sentiment, deeply integrated in the

customs and beliefs of the people and in their conviction of what is just and right".

Defendant's argument is essentially  repetitious in that it argues that Plaintiff cannot prove

the element of wrongful discharge that Defendant violated a clear mandate of public policy. They

argue Plaintiff has not proven that Defendants discriminated against her on the basis of sex or

race. Plaintiff incorporates her previous arguments that her evidence supports a finding of severe

and pervasive sexual harassment which created an abusive and hostile environment in violation of

Title VII.

**Intentional infliction of emotional distress**.

Plaintiff does not oppose dismissal of her claim for intentional of emotional distress since it is duplicates damage from her other claims.

**CONCLUSION**

Plaintiff respectfully submits that are genuine issues of material fact which render

summary judgement inappropriate. Plaintiff has produced sufficient evidence to meet her burden

of proof for her respective claims.

Respectfully submitted.
FELDMAN & PINTO, P.C.


By: _____
        J. Bradley McDermott, Esq.
        I.D. No.: 43934
        1604 Locust Street - 2R
        Philadelphia, PA 19103
        Attorney for Plaintiff
        (215) 546-2604

38