IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MADELINE CRUZ, | CIVIL ACTION |
| Plaintiff, | |
| v. | NO. 02-4372 |
| PENNRIDGE REGIONAL POLICE DEPARTMENT, and OFFICER TIMOTHY MALONEY, | |
| Defendants. | |

**MEMORANDUM**

ROBERT F. KELLY, Sr. J.                                                                                         JULY 29, 2003

    Presently before this Court is the Defendants' Motion for Summary Judgment. In her Second Amended Complaint, the Plaintiff, Madeline Cruz ("Cruz"), alleges that the Defendants, the Pennridge Regional Police Department ("Pennridge") and Officer Timothy Maloney ("Officer Maloney"), an officer with Pennridge, created a hostile work environment, discriminated against her on the basis of her sex (female) and her race (Hispanic), and retaliated against her for her complaints concerning such conduct in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-1, *et seq.* ("Title VII") and the Pennsylvania Human Relations Act, 43 Pa. C.S.A. § 951, *et seq.* ("PHRA"). Cruz also alleges that the Defendants wrongfully terminated her and defamed her.[1] The Defendants dispute these charges and argue

---

[1] Cruz's Second Amended Complaint also alleges intentional infliction of emotional distress. However, Cruz, in her Response to the Motion for Summary Judgment states that she does not oppose dismissal of this claim. (Resp. to Summ. J., p. 34). Therefore, this claim is

that Cruz was terminated because of poor performance. For the following reasons, the Motion will be granted in part and denied in part.

I.  **BACKGROUND**

Cruz began her employment with Pennridge as a part-time police intern on May 29, 1998. On September 23, 1998, at the end of her internship, Cruz was hired as a full time police officer. Cruz was the first minority and first female officer at Pennridge. On November 15, 1998, Cruz injured her back lifting a manhole cover and missed seven weeks of work. Evidently other officers at Pennridge were angered by Cruz's prolonged leave and posted two cartoons making fun of Cruz for being out on leave. Cruz returned to work in January 1999. At the end of her probationary period, on November 9, 1999, Cruz was discharged.

The Defendants claim that Cruz was discharged because she was not sufficiently proficient in firearms usage, had been issued four written reprimands and was sent to a counseling session for various incidences, had overall unsatisfactory performance evaluations, would not follow the chain of command, and because every member of her platoon had complained about her performance as an officer. In their Motion, the Defendants mention the following specific incidences which they allege led to Cruz's termination: (1) Cruz received a written reprimand for reporting two hours late for work on May 19, 1999; (2) Cruz failed her firearms proficiency tests in July 1999 and September 1999, and only passed the tests in October 1999; and (3) on August 3, 1999, Cruz failed to provide the requisite two hour notice upon taking sick leave and failed to appear for a court hearing without notifying the court, which violated department policy.

The Defendants also claim that two memoranda from Officer Maloney to Sargent

---

dismissed and will not be discussed further.

James Apgar ("Sgt. Apgar"), Cruz's supervisor, factored into her termination. In Officer Maloney's memoranda, he stated that: (1) on September 9, 1999, Cruz failed to complete her patrol log and several incident reports, and, thus, Officer Maloney could not locate these documents, and (2) in late August 1999, Cruz received three traffic citations while on vacation in Puerto Rico, which allegedly amounted to conduct unbecoming an officer, in violation of department policy. As a result of Officer Maloney's memoranda, Apgar instructed Cruz to submit a written response to the allegations. Cruz also received written reprimands relating to the contents of Officer Maloney's memoranda and had to undergo a counseling session. In her September 19, 1999 response to Officer Maloney's memoranda, Cruz addressed the incidents and also discussed other incidents which she alleged consisted of sexual and racial harassment.

Specifically, in her September 19, 1999 memorandum, Cruz explained, regarding the missing incident reports and patrol log, that she had told Officer Maloney about her shift activities including certain incidents for which she was filing reports. Moreover, Cruz explained that at the end of her shift, as she was trained to do, she placed the incident reports in the incomplete bin and that it was her intention to complete the reports the following day. Cruz admitted that she forgot to record the incident numbers into her patrol log before she left, but that she rectified the situation the next morning. Cruz also stated that because she was present at Officer Maloney's roll call, he could have asked her the location of the reports if it had been a genuine concern. Regarding her patrol log, Cruz explained that Officer Maloney sent her a routing slip asking about the patrol logs and reports, but that he had checked the box on the slip stating "FYI Need not Return." Because Cruz knew about the missing patrol log, and had intended to rectify the situation the next morning, she did not discuss it further with Officer

3

Maloney.

Concerning the traffic violations in Puerto Rico, Cruz admitted that she was stopped by the local police for a traffic violation. A verbal exchange took place between a passenger in her vehicle and one of the officers. Cruz addressed the passenger's conduct, but Cruz still received several traffic citations. Cruz did not identify herself as a police officer during the incident. Although the Defendants ordered Cruz to produce the violations, she did not have copies to provide. Cruz explained that she had given the citations to a friend in Puerto Rico so that the friend could honor them for her. Cruz stated in her September 19, 1999 memorandum that Officer Maloney had taken several things out of context and had exaggerated the situation. As stated above, Cruz's memorandum also detailed incidents of alleged harassment against her. It is in retaliation for complaining about these incidents that Cruz alleges that she was discharged. These incidents are discussed below in Section III. A. 1. of this Opinion.

In her Response to the Motion for Summary Judgment, Cruz also addresses the other incidents detailed above for which the Defendants claim she was discharged. In general, Cruz argues that her work performance was progressing well until September 1999 when she complained about the alleged severe or pervasive racial and sexual harassment in her written response to Officer Maloney's memoranda to Sgt. Apgar. Cruz claims that she was discharged in retaliation for her complaints and that the Defendants' stated reasons for her termination are pretextual.

Cruz contends that she was two hours late on May 19, 1999 because she had misread her schedule. Cruz maintains that she had never before been late and was never again late for her shift. Cruz alleges that the written reprimand for this incident was an extreme and

4

unwarranted sanction and should not have been a valid basis for her discharge. Cruz further states that other male officers were not reprimanded for such minor episodes.

Cruz also argues that her firearm scores were usually far above passing and that Officer Patrick Karcher ("Officer Karcher") stated that her shooting had improved and that Sargent Rodney T. Blake (" Sgt. Blake") stated that he had no concerns with her shooting. Therefore, Cruz contends that the record does not support Chief Randall Dilling's ("Chief Dilling") statement that she had an unsatisfactory level of firearms performance and proficiency.

In response to Chief Dilling's allegation that she had overall unsatisfactory performance evaluations, Cruz states that during her internship, Officer Maloney gave her good evaluations and indicated that her performance was wonderful. Also, after she was hired full time, Officer Brian Pfaff ("Officer Pfaff") stated that her performance was "average . . . same as any other new officer." (Resp. to Summ. J., Ex. E, pp. 11-14). Cruz further maintains that her evaluations were good and that they showed her improvement until she complained about the alleged harassment in her September 19, 1999 memorandum. Thereafter, Cruz contends that her evaluation scores dropped dramatically. Cruz claims that she was given low scores on these later evaluations in retaliation for her complaints of sexual and racial harassment.

Lastly, Cruz alleges that when she called in sick on August 3, 1999, she expected that the office secretary would call the judge and advise him that she would not be present at the court hearing scheduled that day. Cruz argues that this is the reason why she did not notify the court that she would not be present. Cruz contends that the secretary had taken care of similar situations for male officers in the past. After confronting the secretary, Cruz learned that she would have called the judge had she known that Cruz was out that day.

5

Cruz filed her Second Amended Complaint on July 2, 2002, in which she alleges the following counts: Count I: Gender Discrimination, in which Cruz alleges hostile work environment based on sex discrimination, and retaliation for her complaints about the harassment; Count II: Discrimination Based on Race, in which she alleges hostile work environment based on race discrimination, and retaliation for her complaints about the harassment; Count III: Wrongful Discharge; Count IV: Intentional Infliction of Emotional Distress; and Count V: Defamation.

It appears from Counts I and II in the Second Amended Complaint that Cruz is alleging that the Defendants: (1) subjected her to a hostile work environment based upon race and sex, and (2) that the Defendants retaliated against her for complaining about the harassment by discharging her. However, the briefs supporting and opposing the current Motion also discuss the theory that the Defendants' allegedly discriminatory treatment of Cruz, based on her race and sex, lead to her termination. Therefore, I will address separately, (1) hostile work environment based on sex, (2) hostile work environment based on race, and (3) retaliatory discharge and discriminatory discharge based on sex and race.

## II.    STANDARD

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a

genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. Anderson, 477 U.S. at 249. A factual dispute is material only if it might affect the outcome of the suit under governing law. Id. at 248.

To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather that party must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Similarly, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989)(citing Celotex, 477 U.S. at 325 (1986)). Further, the non-moving party has the burden of producing evidence to establish *prima facie* each element of its claim. Celotex, 477 U.S. at 322-23. If the court, in viewing all reasonable inferences in favor of the non-moving party, determines that there is no genuine issue of material fact, then summary judgment is proper. Id. at 322; Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

### III.   DISCUSSION

#### A.   HOSTILE WORK ENVIRONMENT

A Plaintiff may establish a violation of Title VII by proving that discrimination has created a hostile or abusive working environment. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986). Such harassment is actionable only if it is "so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment." Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001)(internal quotation marks omitted). Moreover, conduct in the workplace is not measured in isolation. In determining whether an environment is

sufficiently hostile or abusive, the alleged incidents of harassment should be objectively judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances, "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 270-271 (internal quotation marks omitted); Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Id. at 271 (internal quotation marks omitted). "'Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at discriminat[ion] ... because of ... sex [or race].'" Ogden v. Keystone Residence, 226 F. Supp.2d 588, 598 (M.D. Pa. 2002) (quoting Oncale, 523 U.S. at 81) (some internal quotation marks omitted).

    1.    **Sex**

There are a series of incidents which Cruz alleges show sexual harassment of a severe or pervasive nature. For example, at some point after Cruz returned from her injury leave, several of her fellow officers allegedly left a message on her voice-mail pretending to be an attorney who was accusing Cruz of touching his client's private parts while he was in her custody. Cruz states that she learned that the incident was a prank when she told these other officers, including Sgt. Apgar, Officer Pfaff and Officer A.J. Burke ("Officer Burke"), about the message and they began to laugh and stated that they just wanted to see how she would react.

In another incident in March 1999, Sgt. Blake allegedly said to Cruz, in front of other officers, that he and the other officers "would have to keep an eye on [Cruz] when [she]

8

was in Lieutenant Sutton's office, so that [she] wouldn't 'do' the Lieutenant" referencing another officer, from another township, who allegedly had an affair with a co-worker. (Resp. to Summ. J., Ex. J, p. 6). Cruz did not complain about this incident until she gave Sgt. Apgar her September 19, 1999 written response to Officer Maloney's memoranda. Sgt. Blake responded in writing to this allegation and stated that he remembered asking Cruz if she knew anything about the officer who allegedly had an affair with another officer, but did not recall making any other comment about Cruz. However, Officer Harry Hallman ("Officer Hallman"), stated in his deposition that he did recall Sgt. Blake making these comments.

In July 1999, Cruz saw a frame on Officer Brian Rickabaugh's ("Officer Rickabaugh") desk that contained a cartoon or picture. The cartoon included a picture of Cruz seated at her desk stating, "I'll show Pennridge Regional who Madeline Cruz is. Where is my new locker room?" Also in the cartoon was Officer Rickabaugh's face which was depicted on a male body which was nude from the waist down. Officer Burke was also portrayed in the cartoon saying "Merry Christmas." After Lieutenant William Sutton ("Lt. Sutton") saw the cartoon, he stated that he was not pleased and he told Sgt. Blake and Sgt. Apgar that he did not want to see that type of picture in the station house again. However, Lt. Sutton allegedly did not investigate who had created the cartoon nor did he issue any reprimands.

On August 10, 1999, Cruz called home to check her answering machine and noticed a call from Chief Dilling. Cruz called the station house and asked for Chief Dilling, who was unavailable. Cruz asked Officer Karcher, who had answered the phone, if he knew why the chief wanted to speak with her. Officer Karcher allegedly responded that "maybe he want[ed] a little something from [Cruz]" and that "just because he's old, doesn't mean he doesn't want

9

some." (Id. at 9). Officer Karcher responded to this incident in writing and claimed only to have said, "[o]h I guess he wants you." (Id., Ex. K, p. 75). However, Officer Hallman stated that he heard Officer Karcher make comments to that effect.

Another incident involved an advertisement from a fitness or body-building magazine for penis enlargement onto which Cruz's and Officer Pfaff's faces had been pasted. The same page featured a similar penis enlargement advertisement onto which Officer Maloney's face had been pasted. Also, on August 3, 1999, after Cruz had called in sick and missed a court appointment, Officer Rickabaugh allegedly told Cruz that she had been acting moody and asked her whether it was her "time of the month." (Id., Ex. J, p. 9).

In her September 19, 1999 response to Officer Maloney's September memoranda, Cruz alleged that Officer Maloney said to her "because you are Hispanic and because you are female, they won't do anything to you." (Id., Ex. K, p. 66). Cruz's September 19, 1999 memorandum also stated that on July 11, 1999, Officer Maloney said he was annoyed that Cruz needed special equipment because she was a woman and had called her "the biggest fucking bitch in the department" two weeks prior. (Id. at 66-67). Officer Maloney, in his written response to Cruz's September 19, 1999 memorandum, admitted that on July 11, 1999 he called Cruz a "bitch" after she called him an "asshole." Officer Maloney also stated that he told Cruz that when she "bitched" about various pieces of gear, she was given new gear and that "because she is a Hispanic female, it does not appear as though they will do anything." (Id. at 77).

Lastly, in early September 1999, other officers allegedly rifled through Cruz's desk, rearranged her desk accessories, put trash on her desk, and placed used gum in a small tin box that she kept in her desk.

The frequency of the alleged incidents was approximately once a month and, overall, the incidents were not overly pervasive. The severity of the conduct varies, but on the whole the conduct was not too severe. The majority of the incidents involved only one off-color comment. Two involved inappropriate cartoons which were removed from circulation. Moreover, none of the incidents involved physical threat. Granted, the comments and cartoons are inappropriate, but they do not rise to the level needed to maintain a Title VII harassment claim. Taken together, these incidents amount to simple teasing, offhand comments, and isolated incidents that are not so severe or pervasive as to allow a claim for hostile work environment based upon Cruz's sex. Therefore, summary judgment on this claim is appropriate.

    2.    **Race**

Cruz alleges three events which she claims amount to severe or pervasive work place harassment based upon her race. First, in the fall of 1998, Officer Maloney allegedly asked Cruz what her colors were. Cruz then asked Officer Maloney what he was talking about and he said, "you know, the colors of your race." (Id., Ex. J, pp. 2-3). Cruz replied, "I have no idea what you are talking about." (Id.). Officer Maloney then responded, "your colors are red and gold." (Id.). Cruz then asked Officer Maloney whether he had any problems with her race. According to Cruz, Officer Maloney then stated, "[n]o, not really, I do have a problem with black people" because he and some friends had been mugged by some "niggers" for no reason. (Id.). Cruz then asked Officer Maloney if he was sure he did not have a problem with Hispanics. Officer Maloney again stated that he did not, but asked her why Puerto Ricans hang the Puerto Rican flag from their rear view mirrors. Cruz explained that many Puerto Ricans do it to show pride in their country. Officer Maloney then allegedly remarked, "if they are so proud then how

11

come they don't stay in their country?" (Id.).

The second incident occurred in the summer of 1999. After Cruz and Sgt. Apgar responded to an automobile accident, a German couple involved in the accident asked Sgt. Apgar to "thank the nice colored girl for us", referring to Cruz. (Id. at 7). According to Cruz, Sgt. Apgar thought this comment was amusing and after he and Cruz returned to the station, Sgt. Apgar told the other officers about the comment. Allegedly, the other officers also laughed and continued to laugh about it for several days.

The third incident, also occurring in the summer of 1999, involved an incident where Cruz responded to a noise complaint at a Hispanic residence. Someone in the residence told Cruz that she was a sell-out for not defending Puerto Ricans. Allegedly, the other officers laughed about this comment for several days.

These three incidents, one in the fall of 1998 and the other two in the summer of 1999, are not frequent or pervasive enough to establish a hostile work environment based on Cruz's race. Moreover, the three incidents are also not sufficiently severe. Officer Maloney's alleged comment concerning Puerto Ricans is an isolated remark, albeit in bad taste. Furthermore, the other two incidents do not involve any comments made by any of Cruz's fellow officers. Because these incidents are not so severe or pervasive as to allow a claim for hostile work environment based upon Cruz's race, summary judgment on this claim is appropriate.

### B. RETALIATORY DISCHARGE/DISCRIMINATORY DISCHARGE

As stated above, Cruz's Second Amended Complaint appears to allege that the Defendants discharged her only in retaliation for her complaints of sexual and racial harassment. However, in both the Defendants' and Plaintiff's briefs for and against summary judgment, the

12

parties address the theory that the Defendants discriminatorily discharged Cruz because of her race and sex. Therefore, we will also address this discrimination argument to the extent that it is truly alleged by Cruz.

In discrimination and retaliation cases, proof at summary judgment follows the well-established burden shifting approach first set forth in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973). Gharzouzi v. Northwestern Human Servs. of Penn., 225 F. Supp.2d 514, 517 (E.D. Pa. 2002). First, a plaintiff must establish a *prima facie* case that he or she was discriminated against and retaliated against in violation of Title VII and the PHRA. To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) he or she engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse action. Weston v. Penn., 251 F.3d 420, 430 (3d. Cir. 2001). In order to establish a *prima facie* case of race or sex discrimination, a plaintiff must show that: (1) he or she is a member of a protected class; (2) he or she was qualified for the position; and (3) he or she was discharged under circumstances that give rise to an inference of unlawful discrimination (i.e. that non-members of the protected class were treated more favorably). Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410-11 (3d Cir. 1999); Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 522 (3d Cir. 1992).

Once a plaintiff has established a *prima facie* case of discrimination or retaliation, the defendant must rebut the inference of wrongdoing with evidence of a legitimate, non-discriminatory or non-retaliatory reason for the action taken. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). Lastly, if this evidence is produced, the plaintiff may survive a motion

13

for summary judgment only if he or she "produce[s] sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action." Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1067 (3d Cir. 1996)(*en banc*).

There are genuine issues of material fact which remain regarding whether Cruz was qualified for the position and whether she was terminated because she complained about incidences of racial and sexual harassment or whether she was subjected to discrimination based upon her race or sex which eventually led to her termination. Therefore, it is inappropriate to grant summary judgment on this claim at this time.

### C.   WRONGFUL DISCHARGE

"Under Pennsylvania law, an at-will employee may have an action for wrongful discharge if he [or she] was terminated in violation of a significant, clearly mandated public policy." Freeman v. McKellar, 795 F. Supp. 733, 741 (E.D. Pa. 1992)(citing Geary v. U.S. Steel Corp., 319 A.2d 174 (Pa. 1974)). "This is an exception to the general rule that employers may terminate at-will employees at any time for any reason, and is very narrowly construed." Id. (citing Bruffett v. Warner Communications, Inc., 692 F.2d 910, 918 (3d Cir.1982)). Moreover, "[t]he protection of employees from [ ] discrimination is without doubt a clearly mandated public policy." Hicks v. Arthur, 843 F. Supp. 949, 957 (E.D. Pa. 1994).

However, a cause of action for wrongful discharge may be maintained only in the absence of a statutory remedy for an aggrieved employee. Freeman, 795 F. Supp. at 742 (citing Novosel v. Nationwide Ins. Co., 721 F.2d 894, 899 (3d Cir. 1983)). Specifically, "claims of racial discrimination in the workplace cannot be heard as claims of wrongful discharge through the

public policy exception where there are statutory remedies available which Plaintiffs may pursue, namely under the Pennsylvania Human Relations Act, Section 1981 and Title VII of the Civil Rights Acts." Hicks, 843 F. Supp. at 949, 957 (E.D. Pa. 1994). Therefore, because there are statutory remedies available to Cruz for her claims of discrimination and retaliation (of which she has taken advantage), her claim for wrongful termination must be dismissed.

### D. DEFAMATION

Cruz alleges that Officer Maloney defamed her in his two September memoranda to Sgt. Apgar detailing her traffic citations in Puerto Rico and the missing incident reports and patrol log. In order to prove defamation, a plaintiff must prove: (1) the defamatory character of the communication; (2) publication by the defendant; (3) its application to the plaintiff; (4) understanding by the recipient of its defamatory meaning; (5) understanding by the recipient of it as intended to be applied to plaintiff; (6) special harm to the plaintiff; (7) abuse of a conditionally privileged occasion. Tucker v. Phila. Daily News, 757 A.2d 938, 942 (Pa. Super. 2000). It is for the court to decide if whether a communication is capable of a defamatory meaning. Rush v. Phila. Newspapers, Inc., 732 A.2d 648, 652 (Pa. Super. 1999). Furthermore, truth is a defense to defamation. Bob. v. Kraybill, 511 A.2d 1379, 1380 (Pa. Super. 1986). "[I]n order to prove the truth of a defamatory statement as a defense to a defamation action, the defendant must prove that it is substantially true." Chicarella v. Passant, 494 A.2d 1109, 1115 n.5 (Pa. Super. 1985)(citing Kilian v. Doubleday & Co., Inc., 79 A.2d 657, 660 (Pa. 1951)). Moreover, "'[a] simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable this opinion may be or how derogatory it is.'" Braig v. Field Communications, 456 A.2d 1366, 1373 (Pa.

15

Super. 1983) (quoting Restatement (Second) of Torts § 566, cmt. b (1977)).

The Defendants claim that Officer Maloney's two memoranda are true, and, thus, he is not liable for defamation. The Defendants allege that Cruz did receive traffic citations in Puerto Rico and that Officer Maloney could not find her incident reports and patrol logs because they were not completed. Cruz does not dispute that she received the traffic citations or that she did not complete her patrol log, which she states was an oversight on her part. However, Cruz alleges that certain statements in the memoranda are nonetheless false.

First, in Officer Maloney's memorandum regarding the traffic citations in Puerto Rico, Cruz claims that the statement that "when [Officer Maloney] asked her what happened, she stated that she got angry with the police officer and got into a verbal argument", is false because it was her passenger who argued with the police officer and not herself. (Resp. to Summ. J., Ex. K, p. 57) Cruz further states that it is incorrect that Officer Maloney asked her about the incident. Cruz claims that Officer Maloney overheard her talking about the incident with Sgt. Apgar. Also, Cruz states that, contrary to Officer Maloney's suggestion, she did not identify her self to the Puerto Rican police as a police officer. However, Officer Maloney actually stated that "[i]f officer Cruz identified herself as a Police Officer of this Police Dept., then her actions reflect very poorly on . . . [the] Dept." (Id.) It is clear that this is a statement of Officer Maloney's opinion and that he did not state that Cruz identified herself as an officer. Cruz also takes offense at Officer Maloney's use of the word "gloat" in the following sentence: "[Cruz] came back to work and told several fellow employees that she was cited in Puerto Rico. I feel that this is not the type of behavior that a person should 'gloat' about." (Id.) It is undisputed that Cruz did tell officers about the citations when she returned to work. Again, this is an expression of Officer Maloney's

16

opinion regarding this conduct. Officer Maloney's first memorandum is substantially true and incorporates several of his opinions. Therefore, it may not be used as a basis for finding defamation.

Second, in Officer Maloney's memorandum concerning the missing incident reports and patrol log, Cruz alleges that it is false that Officer Maloney was unable to find the missing reports and log. Cruz alleges that she told Officer Maloney about her shift activities and that at the end of her shift, she put the incomplete reports in the incomplete bin. Cruz contends that Officer Maloney must have known that the reports would be in the incomplete bin because that was the standard procedure. However, Cruz admits that she failed to record the incident numbers in her patrol log. Also, Cruz alleges that Officer Maloney falsely stated that Cruz did not respond to the routing slip asking why the reports were not completed. Cruz admits that she did not respond to the slip but states that the slip itself indicated that no response was necessary because Officer Maloney had checked the box on the slip marked "FYI Need not Return." Again, Officer Maloney's memorandum is substantially true as the log was not completed properly and Cruz did not respond to the routing slip. While it remains to be seen whether these memoranda are evidence of Officer Maloney's alleged discriminatory or retaliatory scheme, they may not be used to prove a claim for defamation, as it is true that Cruz received traffic citations in Puerto Rico which she discussed with fellow officers upon her return, and she did not finish her incident reports and failed to complete her patrol log. Therefore, summary judgment on this claim must be granted.

E.     **QUALIFIED IMMUNITY**

17

"Government officials performing discretionary functions are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Sharrar v. Felsing</u>, 128 F.3d 810, 826 (3d Cir. 1997) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  Here, genuine issues of material fact remain regarding whether Officer Maloney's conduct was discriminatory or retaliatory so that it violated a clearly established right of which he would have known.  Therefore, I am unable to rule on this issue at this time.

### IV.    **CONCLUSION**

Cruz's claims of hostile work environment under Title VII and the PHRA must fail because the acts complained of were not so objectively severe or pervasive as to alter the conditions of Cruz's employment and create an abusive working environment.  However, because genuine issues of material fact remain regarding whether Cruz was retaliated against and/or discriminated against, to the extent that she alleges them, Cruz's claims of retaliatory discharge and discriminatory discharge must survive summary judgment.  Cruz's claim for wrongful discharge may not survive summary judgment because statutory remedies are available to Cruz which she is currently pursuing under Title VII and the PHRA.  Cruz's claims of defamation against Officer Maloney must fail because his two memoranda are substantially true.  Lastly, because genuine issues of material fact remain regarding the issue of whether Officer Maloney enjoys qualified immunity, this issue may not be resolved at this time.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MADELINE CRUZ, : | CIVIL ACTION |
| Plaintiff, : | |
| v. : | NO. 02-4372 |
| PENNRIDGE REGIONAL POLICE : | |
| DEPARTMENT, and : | |
| OFFICER TIMOTHY MALONEY, : | |
| Defendants. : | |

**ORDER**

**AND NOW**, this 29th day of July 2003, upon consideration of the Defendants' Motion for Summary Judgment (Doc. No. 10), and the Response and Reply thereto, it is hereby ORDERED that the Defendants' Motion is GRANTED in part and DENIED in part.

It is hereby further ORDERED that:

(1) the Plaintiff's claims for hostile work environment based upon sex and race discrimination, wrongful termination, defamation, and intentional infliction of emotional distress are DISMISSED with prejudice; and

(2) the Plaintiff's claims under Title VII and the PHRA for retaliatory discharge and/or discriminatory discharge based upon her sex and race survive summary judgment.

BY THE COURT

Robert F. Kelly, Sr. J.