**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | | |
|---|---|---|
| MADELINE CRUZ | : | |
| 320 Erie Avenue | : | |
| Telford, PA 18969 | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 02-CV-4372 |
| | : | |
| PENNRIDGE REGIONAL POLICE | : | |
| DEPARTMENT | : | |
| 140 East Church Street | : | |
| Sellersville, PA 18960 | : | |
| | : | |
| And | : | |
| | : | |
| OFFICER TIMOTHY MALONEY | : | |
| c/o Pennridge Regional Police | : | |
| Department | : | |
| 140 East Church Street | : | |
| Sellerville, PA 18960 | : | |
| Defendant. | : | |

---

## JOINT PRETRIAL ORDER

1. **JURISDICTION**

The Court has jurisdiction over this civil action which is an action to recover damages

under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*, as amended by the

Civil Rights Act of 1991.  The Court has pendent jurisdiction over plaintiff's state law claims

under the Pennsylvania Human Relations Act, 43 P.S. §951 *et. seq.* and Pennsylvania state law.

This action properly lies in the Eastern District of Pennsylvania, pursuant to 42 U.S.C.

§2000e-5(f)(3) because the unlawful employment practice was committed in this judicial district,

as well as defendant maintaining a principal place of business, in the Eastern District of

Pennsylvania.

PH058705.1

**2.    STIPULATED FACTS**

## I.  LIABILITY

1.      Defendant, Pennridge Regional Police Department is a municipal corporation and/or political subdivision of the Commonwealth of Pennsylvania and more specifically Bucks County and is organized and existing pursuant to the laws of the Commonwealth of Pennsylvania and engaged in police and law enforcement activities for its local jurisdictions and currently maintaining a principal place of business in the Eastern District of Pennsylvania at 140 East Church Street, Sellersville, PA 18960.

2.      Defendant, Timothy Maloney was at all times relevant herein a police officer employed by the Defendant Pennridge Police Department.

3.      After graduation from the Montgomery County Police Academy, Ms. Cruz, a Hispanic female was hired by the defendant on or about May 29, 1998, as a temporary, part-time police intern and told that she would be considered for a full-time position after Labor Day if a position was available.

4.      On September 23, 1998, Plaintiff was hired as a full time police officer.

5.      Plaintiff, Madeline Cruz was the first full-time female police officer ever hired to work for the defendant.

6.       Pursuant to defendant's departmental policy the plaintiff was to serve a minimum one year probationary period with periodic evaluations by her supervisors including, Sergeant James Apgar.

7.       The Pennridge Police Department Police Regulations state that a probationary employee may be terminated from employment at any time within the probationary period.  It

also states in the Police Department Regulations that a probationary period may be extended for an additional six months at the recommendation of the Chief of Police.  Plaintiff acknowledges that she received a copy of these Department Regulations.

7.      On or about November 15, 1998 plaintiff injured her back lifting a man hole cover while in the course of her duties.  Plaintiff was sent for an examination and treatment with a physician at Grandview Hospital selected by the defendant.  The physician recommended a leave of absence from street duties while her injuries healed.  As recommended by the physician plaintiff did not return to full street police duties for seven weeks. As a result of Plaintiff' inability to work, other officers in the Department were required to cover the Plaintiff's shifts during December 1998 and January 1999.

8.      On January 11, 1999, Defendants extended plaintiff's one year probationary period for seven weeks with the stated reason that she had been out of work as a consequence of her back injury.

9.      On May 19, 1999, Plaintiff reported to work two hours late, and one of her co-workers, Officer Roesner, worked two extra hours until she did report for work.  Plaintiff's supervisor, Sgt. Apgar, subsequently recommended that the Plaintiff not receive any punishment beyond a written reprimand for her inability to report to work on time.  Chief Dilling then issued a written reprimand to the Plaintiff in which he advised her of her right to appeal the reprimand.

11.      The parities agree that Pennridge Police Department policy required all officers to be proficient in the handling of firearms consistent with Pennsylvania State Regulations. Pennridge provided its officers with firearms training and testing for qualification purposes. Madeline Cruz was trained and tested for firearms proficiency.

12.     Pennridge Police Department policy requires that probationary officers such as Plaintiff be assigned to a Field Training Officer who, together with each officer's Sargeant, provides quarterly job performance evaluations. After an Officer's probationary period is over Officers are rated for job performance on an annual basis.

13.     For reasons which are disputed by the Parties, Plaintiff's employment was terminated on November 11, 1999.

## II. DAMAGES

The Parties are unable to agree as to stipulated facts regarding damages.

## PLAINTIFF'S DISPUTED FACTS

1.     During her internship, the plaintiff was routinely belittled and treated in a condescending fashion by her field training officer, Timothy Maloney.

2.     During an interview for a full-time position at the end of her internship, a representative of the defendant asked the plaintiff whether she planned to marry, if she was planning on having children.

3.     Throughout her employment, Officer Maloney made derogatory comments about the plaintiff's race. When asked if he had a problem with Hispanics, officer Maloney responded that he had problems with "black people."

4.     Throughout her employment, plaintiff, Madeline Cruz, was repeatedly subjected to gender and racial discrimination and unwelcome sexual overtures including but not limited to sexually offensive and racially discriminatory comments by employees of defendant, Pennridge Regional Police Department.

5.     Defendants extended plaintiff's one year probationary period for seven weeks as a

consequence of her back injury yet the defendant never extended the probationary period for male officers due to a work related injuries.

6.      After making her return to work following her back injury, the harassment and hostility directed towards the plaintiff by her male co-workers escalated.

7.      Her male co-workers ridiculed her in the form of comments and cartoons, calling the plaintiff a "bitch" and implying that the plaintiff was malingering during her medical leave.

8.      Sexually offensive materials regarding the plaintiff and other women were displayed in the workplace including, but not limited to, sexually oriented advertisements with the plaintiff's picture placed thereon so as to embarrass and humiliate the plaintiff.

9.      Plaintiff's field training Officer, Defendant Timothy Maloney, referred to the plaintiff as a "bitch" and would verbally ridicule and demean plaintiff regarding her work in front of the other male officers resulting in further damage to her reputation.

10.     In or around January 1999, the other officers arranged for the plaintiff to get a "prank" telephone voicemail message from "an attorney" who accused the plaintiff of sexually assaulting a prisoner while in her custody.

11.     On or around May 25, 1999, the plaintiff received a letter of reprimand for being late on May 19, 1999.  Male officers were routinely late without receiving such a written reprimands.

12.     The Plaintiff's male co-workers referred to the plaintiff as a "nice colored girl," and routinely made other ethnic related comments to the plaintiff.

13.     Her co-workers placed dead bugs and chewed up gum in her box which contained her personal items including female hygiene products.  They also ransacked her desk.

PH058705.1

14.    On or around July 25, 1999, the Plaintiff discovered another cartoon depicting her and her partner in a sexually compromising position.

15.    In August, the plaintiff called in sick for work and was treated differently than male officers that called in sick, in that her work was not covered and she was inappropriately held responsible for the lack of coverage.

16.    The workplace was full of sexist, pornographic, demeaning and humiliating pictorial/cartoons depicting  Plaintiff alongside male officers with exposed genitals with written comments "You've got to be shitting me if this is the new Regional";

17.    Members of the police force displayed sexist, pornographic, demeaning and humiliating pictorial/cartoons depicting Plaintiff in pornographic advertisements;

18.    Pictorial/cartoons were displayed that referred to Plaintiff as "You fucking bitch. I'll show you hurt." and/or  "Pennridge Regional First Female Set to Retire.";

19.    Plaintiff was repeatedly subjected to incidents of sexist, derogatory racial comments, jokes and ridicule including being asked about her "colors" of her race and being told by her fellow Officer that he only had  problems with "black people" and/or "niggers" but wondering why if Puerto Ricans are so proud "...they don't stay in their own country";

20.    Repeatedly being the object of racist humor by referring  to Plaintiff as the "nice colored girl" and a "sell-out to her race";

21.    Plaintiff was told by a Sergeant  that "...the guys would have to keep an eye on me when I was in Lieutenant Sutton's office, so that I wouldn't 'do' the Lieutenant";

22.    Plaintiff was asked by a fellow officer why she was so moody and asked whether it was her time of the month;

23.    Plaintiff was told by another officer that the Police Chief had telephoned the station looking for sex from Plaintiff and the comment "Maybe he wants a little something from you...just because he's old doesn't mean he doesn't want some";

24.    Plaintiff was ridiculed and referred to as a bitch for requesting certain police equipment designed for females;

25.    Plaintiff was routinely belittled and treated in a condescending fashion by her Field Training Officer and referred to as the "biggest fucking bitch in the department";

26.    That male officers went through her desk and personal items and left chewed gum in a tin where Plaintiff stored tampons and lipstick;

27.    When Plaintiff complained that she was subjected to both racial and sexual harassment she suddenly and dubiously became the subject of written reprimands, poor evaluations and conduct complaints which lead to her termination.

28.    Plaintiff's trip to Puerto Rico and her interaction with local police was misrepresented and blown out of all proportion to the true facts. The Plaintiff's conduct cited as an excuse for her poor performance evaluations and subsequent termination (including the Puerto Rico police incident; filing late reports; firearms skills and performance issues) were all in reality bogus and the scrutiny and discipline she received was out of proportion to that of the male officers.

29.    Plaintiff was not given due credibility (like the male officers) when she attempted to explain the Puerto Rico incident and the late reports.

30.    After each complaint, the discrimination intensified and retaliatory actions were taken against the plaintiff including but not limited to the following:

PH058705.1

a       the plaintiff's probationary period was extended.

b.      Issues regarding plaintiff's work performance were falsely stated and/or grossly

exaggerated in written and verbal reports.

c.      Defendant, Officer Maloney, lodged complaints alleging that the plaintiff had not

completed certain reports and falsely claiming that the plaintiff had behaved

inappropriately when she received a traffic ticket while on vacation.

d.      On or around November 9, 1999, Madeline Cruz' employment was wrongfully

terminated.

31.     The reasons given to support plaintiff's termination were false and/or exaggerated

to hide the true discriminatory and retaliatory nature of her firing.

**DEFENDANTS' DISPUTED FACTS**

1.      On July 9, 1999, Plaintiff failed to pass her annual firearms qualification.  Plaintiff

inability to handle her weapon safely had been previously identified as a concern.  When she

qualified in October 1998, Pennridge's firearms instructor, Sergeant Blake, noted that Plaintiff

was "unfamiliar with the weapon and needed constant reminder to de-cock the weapon."  As a

result of her failure to qualify in July 1999, Plaintiff was ordered to re-qualify in September

1999.  Plaintiff again failed to shoot a qualifying score on September 24, 1999.  It was not until

October 25, 1999 that the Plaintiff was able to shoot a qualifying score with her firearm.

2.      On August 3, 1999, Plaintiff failed to provide the requisite two (2) hours notice of

sick leave to the Department and failed to show for a scheduled court hearing without providing

notice to the court.  Plaintiff's failure to provide notice of her sick leave more than two hours

prior to the start of her shift violated Departmental policies.   Plaintiff's failure to request a

continuance of the court hearing scheduled for that day resulted in the case being dismissed. Plaintiff's failure to notify the court of her inability to attend the hearing also violated Departmental policy.

     3.     At the end of August 1999, Plaintiff vacationed in Puerto Rico.  Upon returning to work after her vacation, Plaintiff advised Defendant Maloney that she received a citation from the police.  Pennridge's regulations prohibit conduct unbecoming an officer.  "Unbecoming conduct" includes "violations of the law."   Officer Maloney then informed Plaintiff's supervisor that she had violated the law while in Puerto Rico.

     4.     Defendant Maloney expressed concern to Sergeant Apgar that the Plaintiff had not completed her requisite Patrol Log nor had she completed several reports.   On September 9, 1999, Defendant Maloney had been unable to locate the Plaintiff's Patrol Log and had also been unable to locate several accident reports, including one involving a school bus.

     5.     In response to Defendant Maloney's complaints, Sergeant Apgar directed Plaintiff to provide written explanations regarding the missing patrol log and reports and to provide a written explanation of the incident which took place on vacation along with copies of the citations.  Additionally, Sgt. Apgar instructed the Plaintiff to provide a written response to her charge of harassment.   With regard to her charge of harassment, Plaintiff was to provide the names of officers an employees involved as well as the specific behavior and incidents the support her allegations.

     6.     Plaintiff provided a written response to Sergeant Apgar in a memorandum dated "9-9-99." With regard to the incomplete incident reports, Plaintiff admitted that she failed to record the incident numbers prior to leaving on the date in question in what she classified as an

"oversight."

7.    With regard to the citations received in Puerto Rico, Plaintiff stated the she was stopped for a minor traffic violation and a verbal exchange between her passenger and the investigating officer ensued.  Plaintiff received a total of four (4) citations for the incident. Plaintiff claims that she left the citations with a friend in Puerto Rico, and was therefore unable to produce copies of the citations.  At the scene of the incident, Plaintiff identified herself as a member of the Pennridge Regional Police Department.

8.    In response to allegations made by Officer Maloney regarding Plaintiff's conduct, Plaintiff submitted a memorandum to her commanding officer.  In the memo, Plaintiff complained of five specific incidents which she believed amounted to harassment.  Plaintiff complained that prior to writing two memos regarding her conduct, Defendants Maloney stated to her that the department would never fire her because she is Hispanic and because she is a woman.    The second incident cited by Plaintiff as harassment involved Officer Karcher. Plaintiff claims that on August 10, 1999, after she informed Officer Karcher that the Chief called he at home, Officer Karcher responded that the Chief "wanted a little something" from her. Plaintiff further complained that on July 11, 1999, Defendant Maloney commented that Plaintiff had received special equipment and that she was the "biggest fucking bitch in the department." The fourth incident with which Plaintiff took issue involved Sergeant Blake.  Officer Robinson, a female officer from a neighboring police department, was alleged to have had a relationship with her one of her superior officers.  Plaintiff further alleged that Sergeant Blake commented that they should keep an eye on Plaintiff when she is in Lt. Sutton's office to make sure that she does not "do" the Lieutenant. Plaintiff lastly cites to a photograph/cartoon in the squad room which

she believed to be offensive and inappropriate.  Plaintiff states that she gave the cartoon to Lt.

Sutton and did not feel it was necessary to file a complaint.

9.      After receiving Plaintiff's memorandum, Lt. Sutton sent a memorandum to Chief

Dilling which details the actions he took with regard to the photograph/cartoon referenced by

Plaintiff.   Lt. Sutton indicated that an employee, other than Plaintiff, had originally brought the

cartoon to his attention.  Lt. Sutton then removed the cartoon from the squad room.  Lt. Sutton

spoke with Sgt. Blake regarding the inappropriateness of the cartoon.  Several weeks after the

cartoon was found in the squad room, Lt. Sutton met with Plaintiff to discuss a rumor that she

stated that she did not have to follow a directive to go through the firearms qualifications course

again.  Lt. Sutton confronted Plaintiff regarding her firearms qualifications, and she responded by

stating that she was being singled out and was contemplating reporting that she was being

harassed.   When asked to cite an example, Plaintiff responded by mentioning the

photograph/cartoon.  This meeting was the first time that Plaintiff had complained to the

Lieutenant about the cartoon.   Lt. Sutton then advised her that she could file a formal complaint

if she felt she was being harassed.

10.      With regard to Plaintiff's allegations concerning Sergeant Blake, Sergeant Blake

denied ever making the comments about Plaintiff and the Lieutenant.  Likewise, Officer Karcher

submitted a memorandum in which he denied commenting that the Chief "wanted a little

something" from the Plaintiff.  Defendant Maloney also prepared a memorandum in which he

questioned Plaintiff's story that he stated that she would never be fired and that she was a

"bitch."  Defendant Maloney did not deny making these comments but stated in the

memorandum that he only made them after Plaintiff called him "an asshole."

PH058705.1

11.    After reviewing the Plaintiff's response to the missing patrol logs accusation, Lt. Sutton recommended to Chief Dilling discipline Plaintiff by issuing a written reprimand.  Lt. Sutton's recommendation was made based on the Plaintiff's inability to adequately explain why she had not completed her patrol logs and incident reports.  Chief Dilling subsequently issued a written reprimand to the Plaintiff.

12.    Sergeant Apgar, Plaintiff's immediate supervisor, prepared a Quarterly evaluation of the Plaintiff's job performance on November 4, 1999, and Lt. Sutton forwarded this evaluation to Chief Dilling.   This review was the final review of the Plaintiff's probationary employment period.  Sergeant Apgar indicates in his review that he was concerned with the Plaintiff's marksmanship and general firearms handling.  Sergeant Apgar also indicated that he had received performance-related complaints from every member of his platoon regarding the Plaintiff.  Additionally, Sergeant Apgar noted that the Plaintiff refused to accept the "chain of command" in the Department.

13.    Lt. Sutton then relayed Sgt. Apgar's concerns to Chief Dilling, and noted that he had witnessed Plaintiff's performance level plummet in the last 3-5 months.  Lt. Sutton noted that although she was permitted to respond to Sgt. Apgar's review, she had chosen not to provide a response.  Lt. Sutton explained that the Plaintiff's job performance weaknesses had resulted "in the need for continuous supervisory intervention which at this point in her probation should be considered unacceptable."

14.    As a result of Plaintiff's final evaluation, Chief Dilling advised the Plaintiff that her employment with Pennridge was being terminated.  In the memo, Chief Dilling cites the following reasons for her termination: (1) overall unsatisfactory performance evaluations during

the Plaintiff's probationary period; (2) a disciplinary history that included four (4) written reprimands and one counseling session; and (3) an unsuccessful level of firearms proficiency.

15.    Plaintiff' employments with Defendant Pennridge was terminated for legitimate job performance-related reasons during her probationary period.

### 3.    DAMAGES OR OTHER RELIEF

The Parties cannot agree as to damages and will rely on the testimony of damage witnesses at the time of trial. Plaintiff will call an economist and a vocational expert who will testify that the economic losses (past and future earnings capacity and lost fringe benefits) sustained by Plaintiff range from $716,484.00 to as high as $1,782,988.00 depending on the her retirement age. Plaintiff will testify as to the effects the termination had on her physical and mental condition . Plaintiff also has a claim for punitive damages.

### 4.    LEGAL ISSUES

Plaintiff maintains that she was qualified for retention as a full time police officer after her probationary period and that she was terminated by the Defendants in retaliation for her complaints of sexual and racist harassment and discrimination in violation of  Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*, as amended by the Civil Rights Act of 1991 and in violation of state law under the Pennsylvania Human Relations Act, 43 P.S. §951 *et. seq.*

Defendants claim Plaintiff was lawfully terminated for legitimate job performance reasons. Defendants further contend that Officer Maloney is entitled to immunity for any actions he took with regard to Plaintiff's employment with Defendant Pennridge Police Department. It is further contended that Defendant Maloney is not liable to Plaintiff.

### 5.    WITNESSES

**PLAINTIFF'S WITNESSES**

**I.    LIABILITY**

1.    Madeline Cruz; Plaintiff will be called to testify regarding her employment at Pennridge and the issues raised by the disputed facts as itemized above. Plaintiff will also discuss her current employment and the effects of the termination on her both economically as well as her physical and mental condition .

2.    Officer Timothy Maloney; – Will be called to testify as to his interactions with Plaintiff during their employment relationship including his evaluations of her job performance; his comments to her of a sexual and/or racial nature. It is anticipated he will be cross examined with his deposition testimony relative to Plaintiff's allegations of discrimination and harassment. as set forth above in Plaintiff's Disputed Facts.

3.    Sgt. James Apgar;-- Will be called to testify regarding Plaintiff's qualifications to as a police officer per the many job performance ratings he oversaw; his handling and awareness of the following--Puerto Rico incident; missing reports; firearms qualifications; pictorials/cartoons;  inappropriate sexual or  racial comments; prank voice message; his knowledge or participation in Plaintiff's treatment by other Officers as set forth in the Plaintiff's Disputed facts; he will be questioned as to the memos he authored relative to Plaintiff; Pennridge policy manual;

4.    Rodney Blake;– Will be called to testify regarding Plaintiff's qualifications as a police officer; and  his handling and awareness of the following--Puerto Rico incident; missing reports; firearms qualifications; pictorials/cartoons;  inappropriate sexual or  racial comments; prank voice message; his knowledge or participation in Plaintiff's treatment by other Officers as

set forth in the Plaintiff's Disputed facts; recommendations as to Plaintiff's qualifications to remain a police officer or be terminated; he will be questioned as to the memos he authored relative to Plaintiff; Pennridge policy manual;

5.      Lieutenant William Sutton; Will be called to testify regarding Plaintiff's qualifications to as a police officer per the many job performance ratings he oversaw; his handling and awareness of the following--Puerto Rico incident; missing reports; firearms qualifications; pictorials/cartoons;  inappropriate sexual or  racial comments; prank voice message; his knowledge or participation in Plaintiff's treatment by other Officers as set forth in the Plaintiff's Disputed facts; recommendations as to Plaintiff's qualifications to remain a police officer or be terminated; he will be questioned as to the memos he authored relative to Plaintiff; Pennridge policy manual;

6.      Chief Randall Dilling; –Will be called to testify regarding Plaintiff's qualifications to as a police officer per the many job performance ratings he oversaw; his handling and awareness of the following--Puerto Rico incident; missing reports; firearms qualifications; pictorials/cartoons;  inappropriate sexual or  racial comments; prank voice message; his knowledge or participation in Plaintiff's treatment by other Officers as set forth in the Plaintiff's Disputed facts; recommendations as to Plaintiff's qualifications to remain a police officer or be terminated; he will be questioned as to the memos he authored relative to Plaintiff; Pennridge policy manual;

7.      Officer Patrick  Karcher -- Will be called to testify as to his comments that "maybe he wants a little something from you." ...  "just because he's old doesn't mean he doesn't want some."  Referring to Chief Dilling. his knowledge or participation in Plaintiff's treatment

by other Officers as set forth in the Plaintiff's Disputed facts; he will be questioned as to the memos he authored relative to Plaintiff;

      8.     Officer Brian Pfaff; Will be called to testify regarding his handling and awareness of the following--Puerto Rico incident; missing reports; firearms qualifications; pictorials/cartoons;  inappropriate sexual or  racial comments; prank voice message; his knowledge or participation in Plaintiff's treatment by other Officers as set forth in the Plaintiff's Disputed facts; he will be questioned as to the memos he authored relative to Plaintiff; Plaintiff's job performance;

      9.     Officer Brian Rickabaugh; Will be called to testify regarding his handling and awareness of the following--Puerto Rico incident; missing reports; firearms qualifications; pictorials/cartoons;  inappropriate sexual or  racial comments; prank voice message; his knowledge or participation in Plaintiff's treatment by other Officers as set forth in the Plaintiff's Disputed facts; he will be questioned as to the memos he authored relative to Plaintiff;

      10.    Officer Harry Hallman; -Will be called to testify regarding his handling and awareness of the following--Puerto Rico incident; missing reports; firearms qualifications; pictorials/cartoons;  inappropriate sexual or  racial comments; prank voice message; his knowledge or participation in Plaintiff's treatment by other Officers as set forth in the Plaintiff's Disputed facts; he will be questioned as to the memos he authored relative to Plaintiff;

      11.    Chief David Mettin; Will be called to testify relative to earning and benefits compensation of Pennridge police officers;

      12.    Terry Mezzei– Will be called to testify regarding her treatment by Chief Dilling and her complaints about his inappropriate conduct which lead her to leave the department;

13.    Rosemary Wheatly– Will be called to testify as to the pictorial/cartoons and her awareness of the following--Puerto Rico incident; missing reports; firearms qualifications; inappropriate sexual or racial comments; prank voice message.

**II. DAMAGES**

1.    David Hopkins– Will testify as to his qualifications and consistently with his expert report on loss of earnings and fringe benefits;

2.    Daniel Rappucci–Will testify as to his qualifications and consistently with his expert report relative to his vocational analysis.

3.    Plaintiff –Will also discuss her current employment and the effects of the termination on her both economically as well as her physical and mental condition .

**DEFENDANTS WITNESSES**

**I. LIABILITY**

1.    Chief H. Randall Dilling
Miami Springs Police Department
201 Westward Drive
Miami Springs, FL   31666

Former Chief of Police for Defendant Police Department.  Chief Dilling will testify with regard to the treatment of the plaintiff, her job performance and any disciplinary actions taken against her.

2.    Lieutenant William Sutton
Indiana Municipal Building
80 North 8th Street
Indiana, PA   15701

Former Lieutenant for Defendant Police Department.  Lt. Sutton will testify with regard to the treatment of the plaintiff, her job performance and any disciplinary actions taken against her.

3.      Chief Stuart Woods
        Richland Police Department
        1328 California Road
        Quakertown, PA  18951

Chief woods is a police officer who was formerly employed by Pennridge during the Plaintiff's tenure.  He will testify regarding plaintiff's job performance and office conduct.

4.      The following are Sergeants who are presently employed by Pennridge Regional Police Department, located at 140 East Church Street, Sellersville, PA  18960. These officers will testify with regard to Plaintiff's job performance as well as knowledge as to the defendants' treatment of the plaintiff:

        Sergeant Apgar
        Sergeant McGlinchey
        Sergeant Blake

5.      The following Police Officers who are presently employed by Pennridge Regional Police Department, located at 140 East Church Street, Sellersville, PA 18960.  These officers will testify with regard to Plaintiff's job performance as well as knowledge as to the defendants' treatment of the plaintiff.:

        Officer Timothy Maloney
        Officer Roesener
        Officer Brian Pfaff
        Officer Karcher
        Officer Brian Rickabaugh
        Officer Bartholomew
        Officer Hallman
        Officer DeCembrino

6.      Defendants will call the following expert witnesses at the time of trial:

        Joseph Stine
        JJS Consulting Associates
        2368 Greensward South
        Warrington, PA 18976

Mr. Stine will testify regarding police procedures, police discipline and other aspects of police employment relevant to the instant case.

## II. DAMAGES

Phillip Spergel
The Pavilion
261 Old York Road
Jenkintown, PA 19046

Dr. Spergel will testify regarding plaintiffs' lost wages and loss of earnings capacity claims.

6.   **EXHIBITS**

Without waiving each parties hearsay objections the Parties admit to the admissibility and authenticity of the following exhibits:

1.    Pennridge Regional Police Department Guidelines

.    2.    Pennridge Regional Memo dated September 15, 1998 - Bate #6

3.    Pennridge Regional Memo dated October 16, 1998 - Bate #16

4.    Pennridge Regional Memo dated November 10, 1998 - Bate # 18-19

5.    Pennridge Regional Memo dated November 17, 1998 - Bate # 20-21

6.    Pennridge Regional Memo dated January 11, 1999 - Bate # 26

7.    Pennridge Regional Routing Slip dated March 16, 1999 - Bate # 31

8.    Pennridge Regional Memo dated March 19, 1999 - Bate # 32-33

9.    Pennridge Regional Memo dated April 7, 1999 - Bate # 34

10.    Pennridge Regional Memo dated August 27, 1998 - Bate # 35

11.    Pennridge Regional Memo dated April 22, 1999 - Bate # 36

12.    Pennridge Regional Memo dated May 19,1999 - Bate # 38

13.    Pennridge Regional Memo dated May 25, 1999 - Bate # 39-40

14.    Pennridge Regional Memo dated May 26, 1999 - Bate # 41

15.    Interdepartmental Memo dated May 25, 1999 - Bate # 42-43

16.    Pennridge Regional Memo dated May 19, 1999 - Bate # 44

17.    Pennridge Regional Memo dated may 26, 1999 - Bate # 45

18.    Pennridge Regional Routing Slip dated May 26, 1999 - Bate # 46

19.    Interdepartmental Memo dated August 5, 1999 - Bate # 48

20.    Interdepartmental Memo dated August 6, 1999 - Bate # 49-50

21.    Pennridge Regional Memo dated August 11, 1999 - Bate # 51

22.    Troop M Camp Letter dated August 10, 1999 - Bate # 52

23.    Pennridge Regional Routing Slip dated August 30, 1999 - Bate # 53

24.    Pennridge Regional Memo dated September 14, 1999 - Bate # 55-56

25.    Pennridge Regional Memo not dated - Bate # 57

26.    Pennridge Regional Memo not dated - Bate # 58

27.    Pennridge Regional Routing Slip dated September 8, 1999 - Bate # 59

28.    Pennridge Regional Memo dated March 3, 1998 - Bate # 60-61

29.    Miscellaneous Form dated September 15 - Bate #62

30.    Pennridge Regional Routing Slip dated September 17, 1999 - Bate # 63

31.    Interdepartmental Memo dated September 9, 1999 - Bate # 64-68

32.    Pennridge Regional Memo dated September 20, 1999 - Bate # 70-72

33.    Interdepartmental memo dated September 20, 1999 - Bate # 73-74

34.     Memo dated September 20, 1999 - Bate #75

35.     Interdepartmental Memo dated September 22, 1999 - Bate #76

36.     Pennridge Regional Memo dated September 22, 1999 - Bate # 77-78

37.     Pennridge Regional Memo dated September 22, 1999 - Bate # 81

38.     Incomplete Accidents dated September 22 - Bate # 82-83

39.     Interdepartmental Memo dated September 22, 1999 - Bate # 84-85

40.     Pennridge Regional Board Meeting Agenda dated September 22, 1999 -

Bate # 86

41.     Interdepartmental Memo dated September 23, 1999 - Bate # 87

42.     Interdepartmental Memo dated September 23, 1999 - Bate # 88

43.     Pennridge Regional Memo dated November 9, 1999 - Bate # 94-95

44.     Pennridge Regional Memo dated November 5, 1999 - Bate # 97-98

45.     Pennridge Regional Police Department Evaluation Report dated November
        4, 1999 - Bate # 99-103

46.     Pennridge Regional Individual Firearms Qualification Report dated

October 13, 1999 - Bate # 104-108

47.     Pennridge Regional Individual Firearms Report not dated - Bate # 109-112

48.     Pennridge Regional Individual Firearms Report not dated - Bate # 113-114

49.     Pennridge Regional Individual Firearms Report not dated - Bate # 115-116

50.     Pennridge Regional Individual Firearms Report not dated - Bate # 117-118

51.     Pennridge Regional Memo dated September 27, 1999 - Bate # 148-149

52.     Pennridge Regional Memo dated August 5, 1999 - Bate #150-151

53.  Pennridge Regional Memo dated September 21, 1999 - Bate # 152

54.  Pennridge Regional Individual Firearms Report not dated - Bate # 153-156

55.  Pennridge Regional Memo dated September 27, 1999 - Bate # 157-158

56.  Pennridge Regional Individual Firearms Report not dated - Bate # 159-160

57.  Pennridge Regional Memo dated September 27, 1999 - Bate # 161

58.  Pennridge Regional Memo dated September 27, 1999 - Bate # 162

59.  Pennridge Regional Memo dated October 1,  1999 - Bate # 163

60.  Pennridge Regional Memo dated September 28, 1999 - Bate # 164

61.  Pennridge Regional Memo dated September 22, 1999 - Bate #166-167

62.  Pennridge Regional Memo dated September 17, 1999 - Bate #168-169

63.  Missing List dated September 15 - Bate # 170

64.  Pennridge Regional Police Department Patrol Log - Bate # 171 - 177

65.  Interdepartmental Memo dated September 22, 1999 - Bate # 178-179

66.  Pennridge Regional Memo dated October 1, 1999 - Bate # 181

67.  Pennridge Regional Memo dated September 25, 1999 - Bate # 182

68.  Pennridge Regional Memo dated September 22, 1999 - Bate # 183

69.  Pennridge Regional Memo dated September 14, 1999 - Bate # 184-185

70.  Interdepartmental Memo dated September 9, 1999 - Bate # 186-190

71.  Pennridge Regional Memo not dated - Bate # 191

72.  Pennridge Regional Memo not dated - Bate # 192

73.  Pennridge Regional Routing Slip dated September 8, 1999 - Bate # 193

74.  Pennridge Regional Memo dated October 1, 1999 - Bate # 194

75.    Pennridge Regional Memo dated September 25, 1999 - Bate # 195

76.    Pennridge Regional Memo dated September 22, 1999 - Bate # 196-197

77.    Pennridge Regional Memo dated September 14, 1999 - Bate # 198-199

78.    Pennridge Regional Memo not dated - Bate # 205

79.    Pennridge Regional Memo not dated - Bate # 206

80.    Pennridge Regional Routing Slip dated September 8, 1999 - Bate # 207

81.    Pennridge Regional Memo dated October 1, 1999 - Bate # 208

82.    Pennridge Regional Memo dated October 8, 1999 - Bate # 209

83.    Pennridge Regional Memo dated October 18, 1999 - Bate # 210-211

84.    Pennridge Regional Routing Slip dated October 20, 1999 - Bate # 212

85.    Pennridge Regional Memo dated October 25, 1999 - Bate # 213

86.    Pennridge Regional Memo dated October 26, 1999 - Bate #214

87.    Pennridge Regional Memo dated October 30, 1999 - Bate # 215

88.    Pennridge Regional Memo dated October 31, 1999 - Bate # 216

89.    Pennridge Regional Memo dated November 1, 1999 - Bate # 217

90.    Pennridge Regional Routing Slip dated November 2, 1999 - Bate # 218

91.    Pennridge Regional Memo dated November 2, 1999 - Bate #219

92.    Letter dated November 19, 1999 - Bate # 220

93.    Pennridge Regional Letter dated November 22, 1999 - Bate # 221

94.    Pennridge Regional Memo dated November 30, 1999 - Bate #223

95.    Pennridge Regional Performance Evaluation - Bate # 224-226

96.    Pennridge Regional Performance Evaluation - Bate # 227-229

97.    Pennridge Regional Daily FTO Observation Report - Bate # 230-232

98.    Pennridge Regional Performance Evaluation - Bate # 233-235

99.    Pennridge Regional Daily FTO Observation Report - Bate # 236-238

100.    Pennridge Regional Memo dated November 14, 1999  - Bate # 239-242

101.    Pennridge Regional Performance Evaluation - Bate # 243-247

102.    Pennridge Regional Performance Evaluation - Bate # 248-250

103.    Pennridge Regional Performance Evaluation - Bate # 251-253

104.    Pennridge Regional Performance Evaluation - Bate # 254-257

105.    Pennridge Regional Performance Evaluation - Bate # 258-260

106.    Pennridge Regional Firearms Qualification - Bate # 261

107.    Pennridge Regional Patrol Log - Bate # 262-263

108.    EEOC Charge - Bate # 308-320

109.    Charge Information Questionnaire - Bate # 328-356

110.    Response to Notice of Charge of Discrimination - Bate # 358-535

111.    Madeline Cruz's Answers to Defendants' Interrogatories

112.    Plaintiff's EEOC and PHRA Charges of Discrimination. Plaintiff may object to any questions which would lead the jury to a conclusion that there was a prior adjudication of her claims. knowledge

113.    Deposition Transcripts of the following witnesses:

        b.    Madeline Cruz;

        c.    Chief Randall Dilling;

        d.    Lieutenant William Sutton;

     e.        Officer Timothy Maloney;

     f.         Officer Harry Hallman;

     g.        Officer Brian Pfaff;

     h.        Officer Brian Rickabaugh

     i.         Rodney Blake

     j.         David Mettin

     k.        James Apgar

114.    Second Amended Complaint with Exhibits and Defendant's Response;

115.    Pennridge Agreement between Police Commission and Pennridge Benevolent Association 1/1/98 to 12/31/99.

**7.  LEGAL ISSUES AND PLEADINGS**

No special comments or amendments contemplated by the Parties.

**8.  TRIAL TIME**

7-10 DAYS

**9.  DISCOVERY EVIDENCE AND TRIAL DEPOSITIONS**

Deposition Transcripts of the following witnesses:

     1.        Madeline Cruz;

     2.        Chief Randall Dilling;

     3.        Lieutenant William Sutton;

     4.        Officer Timothy Maloney;

5.      Officer Harry Hallman;

6.      Officer Brian Pfaff;

7.      Officer Brian Rickabaugh

8..     Rodney Blake

9.      David Mettin

10.     James Apgar

Defendant's may rely on video depositions of Dr. Phillip Spergel, Chief Randall Dilling, and

Lt. William Sutton. The parties have agreed to cooperate with each other and allow witnesses to be

called out of turn to accommodate the schedules of witnesses, counsel and the Court.


**FELDMAN & PINTO**

_____
J. BRADLEY MCDERMOTT, ESQUIRE
ATTORNEY FOR PLAINTIFF


**MARKS, O'NEILL, O'BRIEN &
COURTNEY**


_____
KEVIN J. O'BRIEN, ESQUIRE
TIMOTHY D. RAU, ESQUIRE
ATTORNEYS FOR DEFENDANTS